[No. H031468. Sixth Dist. Mar. 4, 2009.]

LORI SPINKS, Plaintiff and Appellant, v.
EQUITY RESIDENTIAL BRIARWOOD APARTMENTS et al., Defendants
and Respondents.

1006

COUNSEL

Law Offices of Panos Lagos, Panos Lagos; Law Office of Leah Ellen Hess and Leah Ellen Hess for Plaintiff and Appellant.

Prindle, Decker & Amaro, Michael L. Amaro, Roger Derek Classen and Kristie M. Kawakami for Defendants and Respondents.

OPINION

**McADAMS, J.**—This appeal follows the entry of defense summary judgment. Defendants are the landlords of an apartment complex where plaintiff resided, under a lease entered into by her Ohio employer. The employer terminated plaintiff's employment following an industrial injury, and then it directed defendants to change the locks on plaintiff's apartment unit. They complied, thereby causing plaintiff to leave her residence. Plaintiff then instituted this litigation against the landlords alone. Asserting that she was an intended third party beneficiary of the lease, plaintiff alleged 12 causes of action, including contract, tort, and statutory claims. The trial court granted defendants summary judgment on all causes of action, ruling that plaintiff was not an intended beneficiary of the lease and thus not defendants' tenant. The court also awarded defendants their costs of suit, including statutory attorney fees as the prevailing parties.

We reverse the judgment and the fee award. As we shall explain, defense summary judgment on the contract claims is precluded, because the question of plaintiff's status as an intended third party beneficiary of the lease presents triable issues of fact. Summary judgment on the remaining claims is precluded, because of triable issues on the question of whether defendants improperly disturbed plaintiff's peaceful possession through resort to impermissible self-help. Reversal of the summary judgment means that defendants are no longer the prevailing parties; the award of costs and fees in their favor thus cannot stand.

## FACTUAL BACKGROUND

The plaintiff in this action is Lori Spinks. Defendants are EQR-Briarwood, a California limited partnership, and Equity Residential Properties Management Corp. Defendants own and operate Briarwood Apartment Homes in Sunnyvale, California, where plaintiff resided in late 2004 and early 2005.

On October 11, 2004, plaintiff entered into a written employment agreement to work for Mobile Medical Staffing, LLC (Mobile). In the form agreement, the employee is referred to as "Traveler." The employer, Mobile, is located in Dayton, Ohio. In the notice provision of the employment agreement, plaintiff listed an address in Austin, Texas. Plaintiff and Mobile entered into the employment agreement in Louisiana.

The employment agreement called for plaintiff to undertake a 13-week staffing assignment at Stanford University Health Sciences in California. The starting date of the assignment was October 25, 2004.

As part of the employment agreement, plaintiff and Mobile also entered into a housing agreement, which stated that plaintiff would "be housed individually in housing provided by" the employer. Under the housing agreement, only the "spouse and minor children shall be allowed to reside" with the employee. The contract calls for the housing benefit to start at least two days before the work assignment begins. It terminates two days after the assignment ends, under this provision: "Traveler must vacate the housing within 48 hours of the termination date of his/her assignment." The housing agreement further states: "In the event that Traveler breaches this Agreement, [Mobile] shall have the right to initiate eviction proceeding[s] against Traveler."

On October 15, 2004, Mobile entered into a lease agreement with defendants. As provided in the form lease, Mobile rented apartment No. 502 in the Briarwood complex for a 13-week period commencing October 20, 2004. In the space for designating "Residents," the lease names "Corporate Mobile Medical Staff." The nearby space for designating "Occupants" is left blank.

On the same date as the lease was executed, Mobile's director signed a "Letter of Responsibility," which was sent to defendants. In that letter, plaintiff is identified by name as the "Occupant" of the unit. The letter begins: "This is to serve as a Letter of Responsibility for the above named employee, who will reside at Briarwood Apartment Homes, . . . Apt. 502, . . . move in date 10/22/04." After assuming responsibility for specified items, the letter concludes: "The agreement will remain in effect for the duration of occupancy by our employee."

In late October 2004, plaintiff moved into apartment No. 502. The apartment was furnished with furniture rented by Mobile. Plaintiff completed a "Corporate Occupant Application" and a "move-in inspection form" at defendants' request. She was "provided with a resident handbook spelling out rules to be followed by tenants at the property."

In December 2004, plaintiff's work assignment at Stanford was extended for another 13 weeks. The lease term likewise was extended for 13 weeks, to run through May 2, 2005. In the lease extension, plaintiff was identified by name as the occupant of the apartment.

On January 6, 2005, plaintiff was seriously injured at work. She was unable to return to full duty. Plaintiff underwent reconstructive surgery on her hand the following month.

By letter dated February 17, 2005, Mobile notified plaintiff that it would "no longer be providing the housing, utilities, furniture, nor automobile" that she was then using. Plaintiff received Mobile's letter on or about February 21, 2005, when she returned home from the hospital following her surgery. The letter advised: "We will notify PG&E to turn off the utilities as of Monday February 21, 2005. We will instruct Brooks Furniture to 'pick up' the furniture on February 22 or 23, 2005. We have notified the landlord that our staffing agreement has concluded for this assignment and we will no longer be paying the rent."

Plaintiff went to defendants' onsite manager to discuss the letter, "upset . . . that they were going to turn off her electricity." The manager "informed her that that's not going to happen because in the state of California . . . you can't shut someone's electricity off in order to make them get out of an apartment." Mobile's representative was given the same information.

After learning that Mobile would not be allowed to turn off the electricity, its representative "asked if he could request to have the locks changed." Defendants' onsite manager responded that she would need a work order in order to do that. Mobile thereafter "faxed" a letter dated February 21, 2005, informing defendants of "the change of status of apartment 502" and making this request: "Please change the locks on the above unit immediately."

To carry out Mobile's request, defendants' onsite manager "created a work order for maintenance staff to change the locks to Plaintiff's apartment." The manager "informed Plaintiff that the lock would be changed." Plaintiff was "distraught" at the news. Plaintiff told the manager "that she was seriously injured and under doctors' orders to use her arm as little as possible. She informed them that she had been terminated from her employment and had no[] other place to reside."

On February 22, 2005, the furniture was removed from the apartment by the furniture rental company. Plaintiff let the movers in. But Mobile had previously authorized defendants to release keys to the furniture rental company, so that it could remove the furniture.

Later that afternoon, the locks on the apartment were changed by defendants' employee. By that time, plaintiff had packed her belongings but she was "still moving some boxes of stuff." Defendants' onsite manager told plaintiff that "she was sorry, and to please leave the keys with the guy changing the locks."

## PROCEDURAL HISTORY

### Pleadings

In June 2005, plaintiff instituted this action against defendants. Plaintiff asserted that she was a third party beneficiary of the lease and the intended and actual occupant of the apartment. As a result, plaintiff alleged, defendants owed her a duty to comply with California law governing landlord-tenant relationships, which they breached by ousting her from possession of the apartment. Plaintiff asserted 12 causes of action against defendants: three contract claims, seven causes of action sounding in tort, and two statutory claims.[1]

After its demurrer was overruled, defendant EQR-Briarwood answered the complaint, interposing a general denial and 22 affirmative defenses. The affirmative defenses included consent, abandonment, lack of privity of contract, and plaintiff's status as a mere licensee.

### Defense Motion for Summary Judgment

In November 2006, both defendants moved for summary judgment, or, in the alternative, for summary adjudication. Articulating the essence of their position, defendants argued: "Plaintiff cannot establish that she is a tenant of Defendants or an intended third party beneficiary to the lease agreement for the subject apartment and there was no breach . . . of any duty or obligation owed to her."

Plaintiff filed written opposition to the motion, which included additional factual assertions as well as formal evidentiary objections. In support of her contention that she was a third party beneficiary, plaintiff asserted: "The central purpose of the Lease was to provide a residence for Plaintiff Lori Spinks." Beyond that, she argued: "The lease clearly establishes tenancy status for Plaintiff as a third-party beneficiary." Moreover, plaintiff urged,

---

[1] The statutory claims were based on Civil Code sections 1954 and 789.3. Section 1954 limits a landlord's right to enter an occupied residential dwelling. Section 789.3 forbids landlords of residential dwellings from engaging in specified conduct, including changing the locks with intent to oust the resident.

statutory and tort liability would attach even if she were a mere occupant, rather than a tenant.

In reply, defendants objected to "plaintiff's purported additional material facts as irrelevant, lacking the necessary foundation, [proffering] a legal conclusion . . . , and presenting an inaccurate and biased picture of the evidence." Defendants argued: "Contrary to plaintiff's contentions, the material facts before the Court are not in dispute; there is no triable issue of material fact. What the parties require here is the Court's determination of plaintiff's standing under the lease, if any, as a matter of law based on the evidence before it."

### Hearing and Order

On February 13, 2007, the trial court conducted a hearing on the defense summary judgment motion. It issued a written order the following day, granting the motion. The court did not rule on the evidentiary objections.

In its formal order after hearing, the trial court found that plaintiff was not a third party beneficiary of the lease. For that reason, the court said, plaintiff lacked "standing" to bring her contract claims. As for plaintiff's other claims, the court reasoned: "Because Plaintiff cannot show she is an express third party beneficiary, she also cannot show that she was a tenant of the Defendants." On that basis, the court summarily adjudicated plaintiff's tort claims, citing the lack of any legal duty. The court also disposed of the statutory causes of action based on its determination that plaintiff was not defendants' tenant.

### Judgments

On February 22, 2007, summary judgment for defendants was entered. Thereafter, following cross-motions to fix and tax attorney fees, the trial court issued an order awarding defendants statutory fees as prevailing parties, pursuant to Civil Code section 789.3. On May 7, 2007, the court ordered entry of judgment in defendants' favor for costs and fees. The judgment for defendants exceeded $55,000, including attorney fees of more than $52,000, plus costs of just over $3,000.

### Appeal

In April 2007, plaintiff filed a notice of appeal from the summary judgment. The following month, she filed an amended notice of appeal, to include the subsequent judgment for attorney fees and costs.

As she did below, plaintiff asserts that she was an intended beneficiary of the lease and thus defendants' tenant. Alternatively, plaintiff urges, she was at least an occupant in peaceful possession. Plaintiff urges reversal of the defense summary judgment on those grounds. She also maintains her right to seek punitive damages as to several of the causes of action asserted in the complaint. In addition, plaintiff challenges the award of fees, arguing (1) reversal of the judgment requires reversal of the fee award, and (2) in any event, the statute should not be interpreted to allow fees in this situation.

Defendants dispute all of plaintiff's appellate arguments.

## DISCUSSION

As a framework for our analysis of the issues presented here, we begin by describing the rules that govern summary judgments, both in the trial courts and on appeal (part I). Then we describe and apply the law concerning third party contract beneficiaries (II). Thereafter, we address plaintiff's causes of action category by category: first, her contract claims (III); next, her tort claims (IV); and then her statutory claims (V). Then we discuss the parties' contentions concerning punitive damages (VI). Finally, we conclude with plaintiff's challenge to the attorney fee award (VII).

I. *Summary Judgment*

A. *General Principles*

Any party to an action may move for summary judgment. (Code Civ. Proc., § 437c, subd. (a); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) The motion "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); see *Aguilar*, at p. 843.) The object of the summary judgment procedure is "to cut through the parties' pleadings" to determine whether trial is necessary to resolve their dispute. (*Aguilar*, at p. 843.)

"A party may move for summary adjudication as to one or more causes of action within an action, one or more affirmative defenses, one or more claims for damages, or one or more issues of duty . . . ." (Code Civ. Proc., § 437c, subd. (f)(1).) "A motion for summary adjudication may be made by itself or as an alternative to a motion for summary judgment and shall proceed in all procedural respects as a motion for summary judgment." (*Id.*, subd. (f)(2).)

The "party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact . . . ." (*Aguilar, supra,* 25 Cal.4th at p. 850; see Evid. Code, § 110.) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Aguilar,* at p. 851.) Defendants moving for summary judgment may satisfy their initial burden either by producing evidence of a complete defense or by showing the plaintiff's inability to establish a required element of the case. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar,* at p. 853.)

If a moving defendant makes the necessary initial showing, the burden of production shifts to the plaintiff to make a prima facie showing of the existence of a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); see *Aguilar, supra,* 25 Cal.4th at p. 850.) If the plaintiff opposing summary judgment presents evidence demonstrating the existence of a disputed material fact, the motion must be denied. (25 Cal.4th at p. 856.)

Throughout the process, the trial court "must consider all of the evidence and all of the inferences drawn therefrom." (*Aguilar, supra,* 25 Cal.4th at p. 856.) The moving party's evidence is strictly construed, while the opponent's is liberally construed. (*Id.* at p. 843.)

### B. *Appellate Review*

The grant of summary judgment is subject to de novo review on appeal. (*Aguilar, supra,* 25 Cal.4th at p. 860.) We consider all of the evidence submitted by the moving and opposing parties, except that to which objections were made and sustained. (*Ibid.*) "In undertaking our independent review of the evidence submitted, we apply the same three-step analysis as the trial court." (*Bono v. Clark* (2002) 103 Cal.App.4th 1409, 1431 [128 Cal.Rptr.2d 31].) "First, we identify the issues framed by the pleadings. Next, we determine whether the moving party has established facts justifying judgment in its favor. Finally, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable, material fact issue." (*Id.* at p. 1432.)

## II. *Third Party Beneficiaries*

### A. *General Principles*

"California law permits third party beneficiaries to enforce the terms of a contract made for their benefit." (*Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman* (1998) 65 Cal.App.4th 1469, 1485 [77 Cal.Rptr.2d 479] (*Principal Mutual*).) That authority is codified in Civil Code

section 1559, which states: "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."

### 1. Classification as intended or incidental beneficiary

■ Third parties claiming the right to performance under an agreement made by others are classified as either intended or incidental beneficiaries of the contract. As explained in the Restatement Second of Contracts: "An incidental beneficiary is a beneficiary who is not an intended beneficiary." (Rest.2d Contracts, § 302, subd. (2).) As used in Civil Code section 1559, the "word 'expressly . . .' . . . has now come to mean merely the negative of 'incidentally.' " (*Gilbert Financial Corp. v. Steelform Contracting Co.* (1978) 82 Cal.App.3d 65, 70 [145 Cal.Rptr. 448]; accord, *Prouty v. Gores Technology Group* (2004) 121 Cal.App.4th 1225, 1232–1233 [18 Cal.Rptr.3d 178] (*Prouty*).)

### 2. Test for determining third party's status

■ "The test for determining whether a contract was made for the benefit of a third person is whether an intent to benefit a third person appears from the terms of the contract. [Citation.] If the terms of the contract necessarily require the promisor to confer a benefit on a third person, then the contract, and hence the parties thereto, contemplate a benefit to the third person. The parties are presumed to intend the consequences of a performance of the contract." (*Johnson v. Holmes Tuttle Lincoln-Merc.* (1958) 160 Cal.App.2d 290, 297 [325 P.2d 193]; accord, *Prouty, supra,* 121 Cal.App.4th at p. 1232; *Souza v. Westlands Water Dist.* (2006) 135 Cal.App.4th 879, 891 [38 Cal.Rptr.3d 78].) In other words, "the doctrine presupposes that the defendant made a promise which, if performed, would have benefited the third party." (*Souza v. Westlands Water Dist.,* at p. 891.)

Under the intent test, "it is not enough that the third party would incidentally have benefited from performance." (*Souza v. Westlands Water Dist., supra,* 135 Cal.App.4th at p. 891.) "The circumstance that a literal contract interpretation would result in a benefit to the third party is not enough to entitle that party to demand enforcement. The contracting parties must have intended to confer a benefit on the third party." (*Neverkovec v. Fredericks* (1999) 74 Cal.App.4th 337, 348 [87 Cal.Rptr.2d 856].) "The effect of the section is to exclude enforcement by persons who are only incidentally or remotely benefited." (*Lucas v. Hamm* (1961) 56 Cal.2d 583, 590 [15 Cal.Rptr. 821, 364 P.2d 685].)

■ On the other hand, "the third person need not be named or identified individually to be an express beneficiary." (*Kaiser Engineers, Inc. v. Grinnell Fire Protection Systems Co.* (1985) 173 Cal.App.3d 1050, 1055 [219 Cal.Rptr. 626]; accord, *Soderberg v. McKinney* (1996) 44 Cal.App.4th 1760, 1774 [52 Cal.Rptr.2d 635].) "A third party may enforce a contract where he shows that he is a member of a class of persons for whose benefit it was made." (*Garratt v. Baker* (1936) 5 Cal.2d 745, 748 [56 P.2d 225]; see also, e.g., *Soderberg v. McKinney*, at p. 1774; *Souza v. Westlands Water Dist.*, *supra*, 135 Cal.App.4th at p. 891.)

While intent is pivotal, there is no requirement that "both of the contracting parties must intend to benefit the third party . . . ." (*Schauer v. Mandarin Gems of Cal., Inc.* (2005) 125 Cal.App.4th 949, 958 [23 Cal.Rptr.3d 233].) Rather, "it is sufficient that the promisor must have understood that the promisee had such intent." (*Lucas v. Hamm, supra*, 56 Cal.2d at p. 591; accord, *Schauer v. Mandarin Gems of Cal., Inc.*, at p. 958.) Thus, a third party will qualify as an intended beneficiary where "the circumstances indicate that the promisee"— here, Mobile—"intends to give the beneficiary the benefit of the promised performance." (Rest.2d., *supra*, § 302, subd. (1)(b).)

Ultimately, the determination turns on the manifestation of intent to confer a benefit on the third party. (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524 [117 Cal.Rptr.2d 220, 41 P.3d 46].) "Ascertaining this intent is a question of ordinary contract interpretation." (*Ibid.*)

### 3. *Contract interpretation*

■ The primary goal of contract interpretation is to give effect to the parties' intent as it existed at the time of contracting. (Civ. Code, § 1636; *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].)

Intent is to be inferred, if possible, solely from the language of the written contract. (Civ. Code, §§ 1638–1639; *Waller v. Truck Ins. Exchange, Inc., supra*, 11 Cal.4th at p. 18.) Nevertheless, an inflexible "rule that would limit the determination of the meaning of a written instrument to its four-corners merely because it seems to the court to be clear and unambiguous, would either deny the relevance of the intention of the parties or presuppose a degree of verbal precision and stability our language has not attained." (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641].) Thus, other factors may come into play as well.

██ "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." (Civ. Code, § 1647.) "In determining the meaning of a written contract allegedly made, in part, for the benefit of a third party, evidence of the circumstances and negotiations of the parties in making the contract is both relevant and admissible." (*Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d 426, 437 [204 Cal.Rptr. 435, 682 P.2d 1100]; accord, *Souza v. Westlands Water Dist., supra,* 135 Cal.App.4th at p. 891.)

Additionally, a court may consider the subsequent conduct of the parties in construing an ambiguous contract. (*Southern Cal. Edison Co. v. Superior Court* (1995) 37 Cal.App.4th 839, 851 [44 Cal.Rptr.2d 227].) In determining intent to benefit a third party, the contracting "parties' practical construction of a contract, as shown by their actions, is important evidence of their intent." (*Kalmanovitz v. Bitting* (1996) 43 Cal.App.4th 311, 316 [50 Cal.Rptr.2d 332].)

### 4. *Suit by intended beneficiary against promisor*

██ "The action by a third party beneficiary for the breach of the promisor's engagement does not rest on the ground of any actual or supposed relationship between the parties but on the broad and more satisfactory basis that the law, operating on the acts of the parties, creates the duty, establishes a privity, and implies the promise and obligation on which the action is founded." (*Johnson v. Holmes Tuttle Lincoln-Merc., supra,* 160 Cal.App.2d at p. 297.) So long as "the contract remains unrescinded, the relations of the parties are the same as though the promise had been made directly to the third party." (*Prouty, supra,* 121 Cal.App.4th at p. 1232.)

Given the nature of the parties' legal relationship, an intended beneficiary is not required to sue the promisee directly. "It is no objection to the maintenance of an action by a third party that a suit might be brought also against the one to whom the promise was made." (*Johnson v. Holmes Tuttle Lincoln-Merc., supra,* 160 Cal.App.2d at p. 297.) Nevertheless, "a third party beneficiary may not obtain a greater recovery than that which would have been available to the promisee." (*Souza v. Westlands Water Dist., supra,* 135 Cal.App.4th at p. 894.) Furthermore, the intended beneficiary "bears the burden of proving that the promise he seeks to enforce was actually made to him personally or to a class of which he is a member." (*Neverkovec v. Fredericks, supra,* 74 Cal.App.4th at pp. 348–349, fn. omitted.)

██ As noted above, the intended beneficiary has a right of action that continues until the contract has been rescinded in compliance with the rescission statute. (Civ. Code, § 1689; *Principal Mutual, supra,* 65

Cal.App.4th at p. 1486; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 685, p. 772.) "If rescission has not occurred according to the statutory procedures, but the contract is instead terminated for some other reason, a third party beneficiary may still enforce the agreement." (*Principal Mutual*, at p. 1486; cf. *Syufy Enterprises v. City of Oakland* (2002) 104 Cal.App.4th 869, 887–888 [128 Cal.Rptr.2d 808].) Moreover, the contracting parties may not rescind or revoke the contract where the " 'beneficiary has accepted the benefit or has detrimentally acted in reliance thereon' " or where the " 'promisor continues to retain the consideration from the original promisee . . . .' " (*Griffin v. Williamson* (1955) 137 Cal.App.2d 308, 317 [290 P.2d 361], citations omitted; see also, e.g., *Silveyra v. Harper* (1947) 82 Cal.App.2d 761, 766–767 [187 P.2d 83] ["no estoppel exists because respondent in no way changed his position to his damage in reliance on that part of the promise"]; *Principal Mutual*, at p. 1487 [contract benefit survived where there was "no attempt by either party to restore the consideration obtained under the lease"].)

### 5. *Appellate review*

"Generally, it is a question of fact whether a particular third person is an intended beneficiary of a contract." (*Prouty, supra*, 121 Cal.App.4th at p. 1233.) But if "the issue is presented to the court on the basis of undisputed facts and uncontroverted evidence and only a question of the application of the law to those facts need be answered," appellate review is de novo. (*Souza v. Westlands Water Dist., supra*, 135 Cal.App.4th at p. 891; see also, e.g., *Neverkovec v. Fredericks, supra*, 74 Cal.App.4th at p. 351.)

### B. *Analysis*

Applying the foregoing principles to the record before us, we find triable issues of material fact on the question of whether plaintiff was a third party beneficiary of the lease agreement between her employer and defendants.

### 1. *The evidentiary record*

Plaintiff interposed a number of objections to defendants' proffered evidence. The trial court declined to "render formal rulings on the evidentiary objections," stating that it had "disregarded all inadmissible and incompetent evidence in ruling herein." In doing so, the court relied on *Biljac Associates v. First Interstate Bank* (1990) 218 Cal.App.3d 1410 [267 Cal.Rptr. 819]. *Biljac* has since been called into question on this point. (See, e.g., *Demps v. San Francisco Housing Authority* (2007) 149 Cal.App.4th 564, 578 [57 Cal.Rptr.3d 204].) The issue is currently pending in the California Supreme Court. (*Reid v. Google*, review granted Dec. 11, 2007, S158965.) For

purposes of our analysis here, however, we need not weigh in on the validity of the *Biljac* rule.

Nevertheless, we shall discuss one key objection, raised by plaintiff below, which she renews on appeal. That objection concerns the relevance of her employment agreement with Mobile. In plaintiff's view, defendants improperly relied on the employment agreement in an attempt to establish their affirmative defense that she was a mere licensee rather than a tenant under the lease.

Initially, we observe it does not appear that the trial court considered the employment agreement in reaching its decision. In discussing the evidence, the court explicitly cites only the lease, saying: "Defendants have established through the production of admissible evidence, . . . the Lease Agreement . . . , that Plaintiff . . . was not an express third party beneficiary of the lease agreement between Defendants and Mobile." Nowhere in its order does the court mention or rely on any other evidence besides the lease. Thus, it does not appear that the employment agreement was a factor in the trial court's determination that plaintiff lacks standing to enforce the lease agreement.

Moreover, we find only partial merit in plaintiff's objection to the employment agreement as irrelevant. We agree that it has no bearing on her status as a third party beneficiary of the lease. But neither is it entirely irrelevant to the parties' dispute, since it explains both the basis on which plaintiff went into possession and her rights and obligations vis-à-vis Mobile, the promisee under the lease. In that respect, this case is similar to *Diamond Woodworks, Inc. v. Argonaut Ins. Co.* (2003) 109 Cal.App.4th 1020 [135 Cal.Rptr.2d 736]. That case also involved two contracts: (1) an agreement between the plaintiff (Diamond) and an employee leasing company (BSC), which obligated BSC to maintain workers' compensation insurance for the employees it placed at the plaintiff's jobsite; and (2) an agreement between BSC and the defendant insurance company (Argonaut) for the purchase of the required insurance. (*Id.* at p. 1037.) As the court observed, "the two contracts are interrelated, and Argonaut's performance cannot be analyzed outside the context in which its duty arose, i.e., in relation to the BSC-Diamond contract." (*Ibid.*) For similar reasons, the employment agreement in this case is relevant to an understanding of the parties' relationships, and it may be considered for that purpose.

Based on all of the evidence presented below, we proceed to an analysis of whether plaintiff was an intended beneficiary of the lease.

### 2. *The lease agreements*

As a necessary first step in interpreting the contracting parties' intent, we identify the agreement at issue. Plaintiff and defendants agree that the

contract at issue here is the lease executed by Mobile on October 15, 2004, including addenda, and also including the other agreements identified therein as part of the lease.[2] The parties also agree that the lease was extended by Mobile and defendants, by letter dated December 17, 2004.

We next consider the pertinent language of the contract documents. In the October 2004 form lease, in the space for designating "Residents," the agreement names "Corporate Mobile Medical Staff." The nearby space for "Occupants" is left blank. Defendants promised Mobile that they would provide apartment No. 502 from October 20, 2004 to January 24, 2005. As for the lease extension, the December 2004 letter specifically identifies plaintiff as the occupant of apartment No. 502.

a. *Intent to benefit class*

As the contract language makes clear, the most basic aspect of defendants' performance is its obligation to supply Mobile with a place for its staff to live. Indeed, defendants stated as undisputed facts that they "understood that Mobile Medical intended to use Unit 502 to house temporary staff" and that "Mobile Medical executed the lease to house its staff." Obviously, as an entity, Mobile itself could not "reside" in the apartment. The only way that defendants could perform their lease obligation was by providing the apartment to one or more of Mobile's employees. (Cf. *Harris v. Superior Court* (1986) 188 Cal.App.3d 475, 479 [233 Cal.Rptr. 186] [corporation "could render professional medical services . . . only through its employees"].) The benefit of occupancy was a core purpose of the lease; it was not incidental.

As a member of Mobile's staff when the lease was formed, plaintiff arguably was among a class of intended beneficiaries of the lease. (Cf. *Diamond Woodworks, Inc. v. Argonaut Ins. Co., supra,* 109 Cal.App.4th at p. 1042 [plaintiff was intended beneficiary of insurance contract with employee leasing company]; *Zigas v. Superior Court* (1981) 120 Cal.App.3d 827, 835 [174 Cal.Rptr. 806] [low-income tenants were third party beneficiaries of landlords' contract with the United States Department of Housing and Urban Development, which placed limits on rents; "tenants constitute the class which Congress intended to benefit"].)

Nevertheless, it is not clear from the lease or the lease extension that Mobile intended its staff to have the benefit of defendants' performance *without restriction*—that is, for the entire term without regard to any other circumstance, such as continued employment. Nor is it clear that defendants

---

[2] At oral argument, plaintiff conceded that Mobile's letter of responsibility, dated October 15, 2004, is not part of the lease between Mobile and defendants.

understood an intent by Mobile that any given occupant would remain during the entire term. To the contrary, defendants' property manager testified to her understanding that occupants could change during the lease term.

### b. *Intent to benefit plaintiff individually*

The October 2004 lease does not mention plaintiff explicitly, but the December 2004 lease extension letter does identify her by name. This raises an inference that defendants' performance—at least during the lease extension period—was meant to benefit plaintiff specifically. (Cf. *Guntert v. City of Stockton* (1976) 55 Cal.App.3d 131, 141 [126 Cal.Rptr. 690] [though not a party to the lease, corporation was "expressly named" as occupant]; *Marchese v. Standard Realty & Dev. Co.* (1977) 74 Cal.App.3d 142, 147 [141 Cal.Rptr. 370] [where "the lease itself contains a provision that the property may be sublet to a named party," that party "is the beneficiary of lessor's promise to allow [it] to occupy the property"].)

In moving for summary judgment, however, defendants presented evidence reflecting their understanding that the occupants of apartment No. 502 could change during the term of the lease or any extension. Defendants' fact statement No. 10 thus reads: "Defendants understood that . . . the occupants [of apartment No. 502] could change during the lease term." Plaintiff disputed that statement, saying: "This 'fact' is not contained in the deposition testimony cited. That testimony refers to deponent[']s understanding of whether Mobile had a right to terminate occupancy, not whether 'occupants could change during the lease term.'" With this extrinsic evidence of defendants' understanding in conflict, plaintiff's status under the lease should not be adjudicated as a matter of law. (*Neverkovec v. Fredericks, supra,* 74 Cal.App.4th at p. 351.)

Because resort to the contract language alone does not resolve the question of plaintiff's status, we look to the circumstances surrounding the formation and performance of the lease.

### 3. *Other circumstances*

### a. *Circumstances at contract formation*

As explained above, evidence of the circumstances surrounding formation of the contract "is both relevant and admissible." (*Garcia v. Truck Ins. Exchange, supra,* 36 Cal.3d 426, 437; accord, *Souza v. Westlands Water Dist., supra,* 135 Cal.App.4th at p. 891; see also, e.g., *Neverkovec v. Fredericks, supra,* 74 Cal.App.4th at p. 351, fn. 9.)

Here, the relevant circumstances surrounding formation of the lease included the letter of responsibility, which was signed by Mobile's representative on the same day as the lease. In it, plaintiff is identified by name as the "Occupant" of the unit in the subject line. The letter states "the above named employee . . . will reside at" the apartment, "move in date 10/22/04." The letter assumes responsibility for specified items, including that all "lease terms and property regulations are followed by our employee occupying the unit." The letter closes by confirming that Mobile's assumption of responsibility "will remain in effect for the duration of occupancy by our employee." The letter of responsibility thus raises an inference that plaintiff was an intended beneficiary of the lease.

The relevant circumstances surrounding formation of the lease also included execution of the employment agreement. (*Diamond Woodworks, Inc. v. Argonaut Ins. Co., supra*, 109 Cal.App.4th at p. 1037.) According to defendants' undisputed fact statement No. 2 in their moving papers below: "Under the housing agreement, which was part of the employment agreement, Mobile agreed to provide Plaintiff with furnished housing and utilities during her temporary work assignment."

Furthermore, as appears from a comparison of the employment agreement and the lease, the time period covered by plaintiff's work assignment corresponded exactly with the lease term, given the contractual allowances for move-in and move-out. The same is true of the lease extension: the extended lease term likewise corresponded with plaintiff's work assignment dates. And in the lease extension, plaintiff was specifically named as the occupant. Those facts tend to show Mobile's intent to benefit plaintiff by providing housing for her, procured via this lease.

On the other hand, as plaintiff acknowledges, the housing agreement "required [her] to pay for housing if she failed to work all the hours required by the employment contract" or if she "voluntarily" left an assignment. The housing agreement also required her to "vacate the housing within 48 hours of the termination date of [her] assignment." Additionally, the housing agreement states that Mobile "shall have the right to initiate eviction proceedings" against plaintiff in the event of her breach. These provisions suggest that the benefit to plaintiff was not unrestricted, but rather was conditioned on her performance of her employment agreement with Mobile.

b. *Subsequent events*

Some of the contracting parties' actions following execution of the original lease likewise suggest that plaintiff was the intended beneficiary of the lease. For one thing, she was allowed to move into the apartment.

But the import of other subsequent events is in conflict. For example, it is undisputed that plaintiff was required to provide defendants with certain information when she moved in. But the nature and purpose of that information was contested. According to defendants' fact statement No. 11: "The employee occupants only provided Moving Defendants with identification and emergency contact information." In supporting evidence explaining the purpose of that information, defendants' property manager testified that it was required so that defendants "would know if she's a criminal or who to contact if there was an emergency." Plaintiff disputed defendants' fact statement, saying instead that she "was required to fill out an application and a move-in inspection form for Defendant." In reply, defendants also point out that "plaintiff was required to complete a walk-through on behalf of Mobile Medical pursuant to her employment/housing agreement."

On the disputed question of whether Mobile bore "full responsibility" for the apartment, plaintiff responded to defendants' fact statement No. 12 by saying that she was "provided with a resident handbook spelling out rules to be followed by tenants at the property." But as defendants pointed out in their reply, "Plaintiff's employment/housing agreement required her to follow all rules at the complex. Clearly she would need to be informed of what these rules were."

These later actions are relevant to the contracting parties' understanding of whether plaintiff was the specific person who would be residing in the apartment and who therefore would be benefited by the lease. And while they do not support determination of plaintiff's status as a third party beneficiary as a matter of law, they do demonstrate the existence of a material fact dispute on this key point.

### 4. *Conclusion*

This record discloses the existence of a triable issue of fact on the question of whether plaintiff was an intended third party beneficiary of the lease between defendants and Mobile. If plaintiff can prove that status at trial, she will enjoy certain substantive legal rights.

With that understanding in mind, we now consider whether defendants established their right to summary judgment on the substantive claims asserted in plaintiff's complaint. We start by analyzing plaintiff's contract claims.

### III. *Contract Claims*

In her complaint, plaintiff asserted three causes of action sounding in contract: breach of contract (sixth cause of action); breach of the implied

covenant of good faith and fair dealing (fourth cause of action); and breach of the implied covenant of quiet enjoyment (third cause of action). As we now explain, none of these contract claims should have been summarily adjudicated.

### A. Breach of Contract

#### 1. Elements of the cause of action

■ "A cause of action for breach of contract requires pleading of a contract, plaintiff's performance or excuse for failure to perform, defendant's breach and damage to plaintiff resulting therefrom." (*McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1489 [49 Cal.Rptr.3d 227].)

#### 2. Plaintiff's right to sue

Assuming that plaintiff was a third party beneficiary of the lease, she would have the right to sue for its breach. That right continues so long as the lease has not been formally rescinded. (*Prouty, supra*, 121 Cal.App.4th at p. 1232; *Principal Mutual, supra*, 65 Cal.App.4th at p. 1486.)

Here, according to the undisputed evidence, the lease "was never rescinded." That being so, "the relations of the parties are the same as though the promise had been made directly to the third party." (*Prouty, supra*, 121 Cal.App.4th at p. 1232.) Plaintiff thus was entitled to sue for breach of the lease, on proving that she was a third party beneficiary.

#### 3. Nature of the claims as contractual

Plaintiff's right of action derives from the contractual aspects of the lease.

■ "A lease is both a contract and a conveyance; under such an agreement there are rights and obligations based upon the relationship of landlord and tenant as well as upon the contractual promises." (*Beckett v. City of Paris Dry Goods Co.* (1939) 14 Cal.2d 633, 636 [96 P.2d 122].) "This dual character serves to create two distinct sets of rights and obligations—'one comprising those growing out of the relation of landlord and tenant, and said to be based on the "privity of estate," and the other comprising those growing out of the express stipulations of the lease, and so said to be based on "privity of contract."'" (*Medico-Dental etc. Co. v. Horton & Converse* (1942) 21 Cal.2d 411, 418 [132 P.2d 457]; see also, e.g., *Ellingson v. Walsh, O'Connor & Barneson* (1940) 15 Cal.2d 673, 675 [104 P.2d 507].) "Because of the dual aspects of the relationship . . . , landlord-tenant rights, obligations and remedies turn on both real property and contract law. Many times, the two

bodies of law produce conflicting results . . . ." (Friedman et al., Cal. Practice Guide: Landlord—Tenant (The Rutter Group 2008) ¶ 2:3, p. 2A-5 (rev. # 1, 2007).)

Because plaintiff's claims depend on her asserted status as a contract beneficiary, it is the lease's contractual features that concern us here. Conversely, at least at this point in our analysis, the "rights and obligations based upon the relationship of landlord and tenant" are not called into play. (*Beckett v. City of Paris Dry Goods Co., supra,* 14 Cal.2d at p. 636.) In other words, plaintiff's claimed status as an intended beneficiary of the lease—in and of itself—does not necessarily create any privity of estate between her and defendants.[3] Rather, it creates privity of contract, entitling plaintiff to sue "upon the contractual promises." (14 Cal.2d at p. 636.)

### 4. *Facts supporting plaintiff's claim for breach of contract*

As alleged in the complaint, on February 22, 2005, defendants entered "the subject premises with no notice and for the purpose of terminating Plaintiff's occupancy rights," and "removed furniture and changed the locks to the subject premises." At that time, the lease was still in force, having been extended through May 2, 2005.

Concerning the furniture removal, it is undisputed that Mobile informed defendants' employee "that it had plans to remove the furniture from Plaintiff's apartment." By facsimile transmission, Mobile sent "a letter purporting to authorize Defendant to release keys to the furniture company." According to deposition testimony by defendants' onsite manager, that gave them "permission to enter, to allow the furniture company keys to remove their belongings." Nevertheless, defendants asserted, they "had no involvement with the removal of the furniture. They did not unlock or open the apartment's door for the movers and were not present when the movers were there." Even so, defendants apparently acquiesced in Mobile's plan to allow the furniture movers access by agreeing to release keys to the furniture company.

---

[3] Privity of estate can take different forms. As one commentator explains: "All landlord-tenant relationships share in common the basic conveyance and contract elements. But each type of tenancy . . . is distinguishable by certain unique characteristics." (Friedman et al., Cal. Practice Guide: Landlord—Tenant, *supra,* ¶ 2:4, p. 2A-6 (rev. # 1, 2007); see *id.,* ¶¶ 2:6 to 2:26, pp. 2A-6 to 2A-12 [discussing tenancies for years, tenancies at will, periodic tenancies, and tenancies at sufferance, also called holdover tenancies].) "Other two-party relationships may have characteristics similar to those typical of a landlord-tenant relationship." (*Id.,* ¶ 2:28, p. 2A-12 (rev. # 1, 2002).) That category would include licenses. "Nonetheless, the legal rights attaching to these other relationships are *distinct* from those attaching to the various *tenancies* discussed above . . . ." (*Id.,* ¶ 2:28, p. 2A-13 (rev. # 1, 2005).)

As necessary to our analysis of plaintiff's tort and statutory claims, we discuss these property law concepts, *post,* starting in part IV.

As for the lock change, the undisputed facts demonstrate that "Mobile Medical instructed . . . Defendants to change the lock on Unit 502." To carry out that instruction, defendants' onsite manager "created a work order for maintenance staff to change the locks to Plaintiff's apartment." Defendants "informed Plaintiff that the locks would be changed." And defendants' maintenance worker in fact "changed the lock" on plaintiff's apartment. Defendants understood that the reason for the requested lock change was "because Mobile Medical wanted Plaintiff out of the premises."

██ Based on these facts, a jury could find that defendants displaced plaintiff from occupancy of the apartment while the lease was still in force, conduct that could constitute an actionable breach of the lease. (*Richardson v. Pridmore* (1950) 97 Cal.App.2d 124, 129 [217 P.2d 113] ["the wilful eviction of a tenant is a breach of contract"].) Defendants thus are not entitled to summary adjudication on this cause of action.

Nor can defendants' actions be justified as a matter of law, by framing them as mere compliance with directives from Mobile, their tenant. (Cf. *Brown Derby Hollywood Corp. v. Hatton* (1964) 61 Cal.2d 855, 858 [40 Cal.Rptr. 848, 395 P.2d 896] ["consent of the landowner to the encroachment cannot prevent the tenant from asserting his rights, for a landowner cannot interfere with his tenant's possession or enjoyment by allowing others to enter upon the land"].) Had they "not followed the instructions of their tenant," defendants assert, "they would have been exposed to a possible action for breach of contract by Mobile Medical." That assertion finds no support either in the lease terms or in the law, and it does not support the grant of summary adjudication here.

### B. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

#### 1. *Legal principles*

██ "The prerequisite for any action for breach of the implied covenant of good faith and fair dealing is the existence of a contractual relationship between the parties, since the covenant is an implied term in the contract." (*Smith v. City and County of San Francisco* (1990) 225 Cal.App.3d 38, 49 [275 Cal.Rptr. 17].) " 'The implied covenant of good faith and fair dealing is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract.' " (*Pasadena Live v. City of Pasadena* (2004) 114 Cal.App.4th 1089, 1094 [8 Cal.Rptr.3d 233], italics omitted.)

Intended contract beneficiaries may "possess the rights of parties to the contract." (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 406, fn. 16 [11 Cal.Rptr.2d 51, 834 P.2d 745]; see *Prouty, supra,* 121 Cal.App.4th at p. 1232.) Those rights may include the benefits of the implied covenant of good faith and fair dealing in a proper case. (Cf. *Murphy v. Allstate Ins. Co.* (1976) 17 Cal.3d 937, 943–944 [132 Cal.Rptr. 424, 553 P.2d 584].)

## 2. *Application*

Here, the complaint alleges that defendants violated the implied covenant of good faith and fair dealing when they "failed to provide Plaintiff with a place of residence and failed to obey the law in dispossessing Plaintiff from the subject premises." The underlying facts, described above, could support judgment for plaintiff on this claim, assuming that she can prove her status as a third party beneficiary. This claim thus should not have been summarily adjudicated.

## C. *Breach of the Covenant of Quiet Enjoyment*

### 1. *Legal principles*

 "In every lease the landlord impliedly covenants that the tenant shall have quiet enjoyment and possession of the premises. In California this covenant is partially expressed in Civil Code section 1927, which guarantees the tenant against rightful assertion of a paramount title." (*Guntert v. City of Stockton, supra,* 55 Cal.App.3d at p. 138.) The statute provides: "An agreement to let upon hire binds the letter to secure to the hirer the quiet possession of the thing hired during the term of the hiring, against all persons lawfully claiming the same." (Civ. Code, § 1927.) "Beyond the statutory covenant, the landlord is bound to refrain from action which interrupts the tenant's beneficial enjoyment." (*Guntert v. City of Stockton,* at p. 138.)

The covenant protects all "hirers" of property, as statutorily defined. The relevant provisions are found in the Civil Code, division 3, part 4, title 5, chapters 1 and 2. Chapter 1 deals with the "hiring" of property in general. (Civ. Code, § 1925 et seq.) The statutory warranty of quiet possession is contained within this chapter. (Civ. Code, § 1927.) Chapter 2 deals with the "hiring" of real estate. (Civ. Code, § 1940 et seq.) Generally speaking, that chapter applies broadly "to all persons who hire dwelling units located within this state including tenants, lessees, boarders, lodgers, and others, however denominated." (Civ. Code, § 1940, subd. (a).) The only exceptions are for

certain transient hotel guests. (*Id.*, subd. (b).)[4] As this broad statutory definition makes clear, the covenant of quiet enjoyment protects not only "tenants" but all "hirers" of real property.

 Determining whether there has been a breach of the covenant of quiet possession generally "depends upon the facts in a proper case." (*Stockton Dry Goods Co. v. Girsh* (1951) 36 Cal.2d 677, 682 [227 P.2d 1]; see also, e.g., *Andrews v. Mobile Aire Estates* (2005) 125 Cal.App.4th 578, 593 [22 Cal.Rptr.3d 832].)

Breach can take many forms, including actual or constructive eviction. (See, e.g., *LaFrance v. Kashishian* (1928) 204 Cal. 643, 644 [269 P. 655] [covenant breached where "plaintiff was evicted from the leased premises by one who had established paramount title to the property"]; *Guntert v. City of Stockton, supra*, 55 Cal.App.3d at p. 139 ["arbitrary and unreasonable notice of termination violated the lessor's implied obligation to abstain from interference with the tenant's use and enjoyment of the premises"]; *Goldman v. House* (1949) 93 Cal.App.2d 572, 576 [209 P.2d 639] [under the covenant of quiet enjoyment, "attempt to evict by the use of wrongful and malicious means with knowledge of probable injury is actionable"]; see *id.* at p. 574 ["defendants wilfully and maliciously shut off the electric current" and the tenant "fell down the darkened stairway and sustained injuries"].) Pursuant to another provision of division 3, part 4, title 5, chapter 2, the hirer or tenant need not even "be actually or constructively evicted in order to obtain relief." (Civ. Code, § 1940.2, subd. (a)(3).)

## 2. *Application*

Applying the facts in the evidentiary record to the statutory definition, plaintiff argues that she was a "hirer" of the apartment. (Civ. Code, § 1940; see *Ellingson v. Walsh, O'Connor & Barneson, supra*, 15 Cal.2d at p. 675.) Defendants implicitly dispute this characterization, asserting that plaintiff was staying in the apartment "without paying rent, and without providing employment services for which she initially received the permission to stay at the unit rented by Mobile Medical." As plaintiff points out, however, "she received the apartment as part of her compensation." That fact was known to defendants. (See, e.g., *Tappe v. Lieberman* (1983) 145 Cal.App.3d Supp. 19, 24 [193 Cal.Rptr. 514] [residents received housing in lieu of wages].) At the very least, there is a disputed factual issue on the question. (Cf. *Eichhorn v.*

---

[4] Civil Code section 1940, subdivision (b) thus provides: "The term 'persons who hire' shall not include a person who maintains either of the following: [¶] (1) Transient occupancy in a hotel, motel, residence club, or other facility" as described or "(2) Occupancy at a hotel or motel where the innkeeper retains a right of access to and control of the dwelling unit and the hotel or motel provides or offers . . . services to all of the residents" as described.

*De La Cantera* (1953) 117 Cal.App.2d 50, 54 [255 P.2d 70] [jury decided that mortgage and utility "payments were rental and hence that the Eichhorns were tenants, not licensees"].)

As for the breach, the complaint alleges that defendants "seriously impaired the Plaintiff's quiet use and enjoyment" by engaging in the acts described above, thereby breaching the covenant.

The facts in this record, described above, could support judgment for plaintiff on this claim. Summary adjudication for defendants thus was improper on this cause of action.

## IV. *Tort Claims*

In addition to her contract claims, plaintiff asserted seven tort causes of action: wrongful eviction (fifth cause of action); trespass (seventh cause of action); negligent and intentional invasion of privacy (eighth and ninth causes of action); negligent and intentional infliction of emotional distress (first and second causes of action); and negligence (12th cause of action).

 Based on its determination that plaintiff was not a third party beneficiary of the lease, and thus not defendants' tenant, the trial court summarily adjudicated plaintiff's tort claims, citing the lack of any legal duty towards plaintiff on defendants' part.

As explained above, however, the trial court erred in reaching that conclusion; it remains a disputed material fact whether plaintiff was an intended beneficiary of the lease contract. Defendants thus have not demonstrated the absence of a legal duty toward her. (*Garcia v. Borelli* (1982) 129 Cal.App.3d 24, 32 [180 Cal.Rptr. 768] [intended beneficiaries of will could recover "on a tort liability for breach of duty owed directly to" them].)

Nor have defendants otherwise established their entitlement to summary adjudication of any of plaintiff's tort claims. In part, our analysis on this point is grounded in long-standing principles of real property law. Applying those principles, the evidence supports the conclusion that plaintiff was in peaceful possession of the premises, being an "occupant" of the premises as defined in and protected by the relevant statutes; at the very least, triable issues exist on that question. If plaintiff was in peaceful possession, defendants had a legal duty not to interfere with her peaceful possession through the use of impermissible self-help. This record presents evidence from which the trier of

fact could find that defendants breached that duty to plaintiff and that she was harmed thereby.

We explain these conclusions below. In doing so, we address each of plaintiff's tort claims separately, starting with her wrongful eviction cause of action. As to each, we first describe and then apply the applicable legal principles.

### A. *Wrongful Eviction*

The law provides both statutory and tort remedies for wrongful eviction. Though plaintiff sued in tort, an understanding of the statutory remedies will prove helpful in analyzing plaintiff's tort claim.

### 1. *Statutory remedies*

Statutory remedies are available for forcible entry and detainer, including those committed by a landlord. (Code Civ. Proc., §§ 1159, 1160.)[5] As discussed below, those remedies are not limited to "tenants" alone.

The forcible entry statute protects a "party in possession." (Code Civ. Proc., § 1159.) "The 'party in possession' refers to any person who 'hires' real property." (Friedman et al., Cal. Practice Guide: Landlord—Tenant, *supra*, ¶ 7:6, p. 7-3 (rev. # 1, 2006); see Civ. Code, §§ 1925, 1940.) With exceptions for transient hotel guests, that includes "all persons who hire dwelling units located within this state including tenants, lessees, boarders, lodgers, and others, however denominated." (Civ. Code, § 1940, subd. (a).) At trial, the plaintiff is required to show only "that he was peaceably in the actual possession at the time of the forcible entry." (Code Civ. Proc., § 1172.)

---

[5] Code of Civil Procedure section 1159 provides: "Every person is guilty of a forcible entry who either: [¶] 1. By breaking open doors, windows, or other parts of a house, or by any kind of violence or circumstance of terror enters upon or into any real property; or, [¶] 2. Who, after entering peaceably upon real property, turns out by force, threats, or menacing conduct, the party in possession. [¶] The 'party in possession' means any person who hires real property and includes a boarder or lodger, except those persons whose occupancy is described in subdivision (b) of Section 1940 of the Civil Code."

Code of Civil Procedure section 1160 provides: "Every person is guilty of a forcible detainer who either: [¶] 1. By force, or by menaces and threats of violence, unlawfully holds and keeps the possession of any real property, whether the same was acquired peaceably or otherwise; or, [¶] 2. Who, in the night-time, or during the absence of the occupant of any lands, unlawfully enters upon real property, and who, after demand made for the surrender thereof, for the period of five days, refuses to surrender the same to such former occupant. [¶] The occupant of real property, within the meaning of this subdivision, is one who, within five days preceding such unlawful entry, was in the peaceable and undisturbed possession of such lands."

The forcible detainer statute protects the "occupant of real property," meaning one "in the peaceable and undisturbed possession of such lands." (Code Civ. Proc., § 1160; see *Moldovan v. Fischer* (1957) 149 Cal.App.2d 600, 607 [308 P.2d 844].)

For occupants in peaceful possession of real property, these statutes offer protection from self-help, without regard to the parties' legal claims to title or possession. "The statutes . . . reflect a policy, with deep roots in English law, barring the use of forceful self-help to enforce a right to possession of real property and requiring instead the use of judicial process to gain possession." (*Glass v. Najafi* (2000) 78 Cal.App.4th 45, 48–49 [92 Cal.Rptr.2d 606].)

As the California Supreme has said: "Both before and after the enactment of the present forcible entry and detainer statutes this court held that ownership or right of possession to the property was not a defense to an action for forcible entry." (*Jordan v. Talbot* (1961) 55 Cal.2d 597, 603 [12 Cal.Rptr. 488, 361 P.2d 20], fn. omitted.) Witkin explains: "A tenant holding over without permission is technically a trespasser. But by statute the owner must use the unlawful detainer procedure, and, if the owner ousts the tenant forcibly, the tenant may regain possession by an action for forcible entry." (5 Witkin, Summary of Cal. Law, *supra*, Torts, § 421, p. 636.) Landlords thus may enforce their rights "only by judicial process, not by self-help." (*Jordan v. Talbot*, at p. 604.) "Regardless of who has the right to possession, orderly procedure and preservation of the peace require that the actual possession shall not be disturbed except by legal process." (*Id.* at p. 605; see also, e.g., *Daluiso v. Boone* (1969) 71 Cal.2d 484, 493 [78 Cal.Rptr. 707, 455 P.2d 811] [these statutes are "intended to discourage self-help in the settlement of disputes over possession of land and to encourage resort to the courts in all such matters"].)

Conduct such as that alleged here could support recovery under the forcible entry statute. As the California Supreme Court said in *Jordan*: "Section 1159, subdivision 1, prohibits an entry by means of breaking open doors or windows. Defendant violated this section when he unlocked plaintiff's apartment without her consent and entered with the storage company employees to remove her furniture, even though there was no physical damage to the premises or actual violence." (*Jordan v. Talbot, supra*, 55 Cal.2d at p. 605.) The court went on to say: "Even if we were to interpret the first subdivision of section 1159 as being inapplicable unless a door or window was physically damaged or threats of violence actually occurred, the *evidence* in the instant case would nevertheless support a finding of forcible entry as defined by subdivision 2 of section 1159. Under that subdivision a forcible entry is completed if, after a peaceable entry, the occupant is excluded from possession by force or threats of violence." (*Id.* at p. 607,

italics added.) In *Jordan*, defendant's agent shouted at plaintiff to get out. (*Ibid.*) But the court also observed: "The removal of plaintiff's furniture without her consent rendered the apartment unsuitable for residence and forced her to seek shelter elsewhere." (*Ibid.*)

Other cases demonstrate that same principle—that a nonviolent lock change can support a statutory claim for forcible entry. (See, e.g., see *Lamey v. Masciotra* (1969) 273 Cal.App.2d 709, 713, 715 [78 Cal.Rptr. 344]; *Karp v. Margolis* (1958) 159 Cal.App.2d 69, 73 [323 P.2d 557].) "Forcible entry is not confined to cases where a fight takes place, or physical force or restraint is used, or there are threats of physical harm." (*Karp v. Margolis*, at p. 73; see *Lamey v. Masciotra*, at p. 715.) There is a statutory violation if "entry was made by breaking locks, without any other show of force, threat or intimidation." (*Karp v. Margolis*, at p. 73.) The same is true where a locksmith is employed to peaceably change the lock. (*Lamey v. Masciotra*, at p. 715.) "No flat breach of the peace is necessary [citation], the statute being enacted to obviate such incidents of self help as occurred here." (*Karp v. Margolis*, at p. 73.)

### 2. *Tort remedies*

The statutory remedies are not exclusive. Quite apart from the statutes, "a person in peaceable possession of real property may recover, in an action sounding in tort, damages for injuries to his person and goods caused by the forcible entry of one who is, or claims to be, the lawful owner or possessor . . . ." (*Daluiso v. Boone, supra*, 71 Cal.2d at p. 486; see Friedman et al., Cal. Practice Guide: Landlord—Tenant, *supra*, ¶ 7:37, p. 7-10.3 (rev. # 1, 2008) [describing this claim as an action for "wrongful eviction"].) As with statutory claims, "the forcibly entering defendant's title or right of possession is no defense to such action." (*Daluiso v. Boone*, at p. 486.) "The recovery includes all consequential damages occasioned by the wrongful eviction (personal injury, including infliction of emotional distress, and property damage) . . . and, upon a proper showing of 'malice,' punitive damages." (Cal. Practice Guide, at pp. 7-10.3 to 7-10.4 (rev. # 1, 2008).)

### 3. *Application*

The evidence presented here could support plaintiff's tort claim for wrongful eviction, as to both required prongs: plaintiff's possession and defendants' forcible entry.

#### a. *Plaintiff's possession*

The first requirement for tort recovery is a showing that the plaintiff was "in peaceable possession" of the premises. (*Daluiso v. Boone, supra*, 71

Cal.2d at p. 486.) Defendants argue that plaintiff cannot claim to have been in peaceable possession, based on two theories: (1) she was a mere licensee; and (2) by holding over after employment termination, she was a trespasser.[6]

 Defendants first assert that plaintiff was a mere licensee of her employer, with no right to possession of the premises. "A 'license' is a personal, revocable and generally nonassignable privilege conferred (either orally or in writing) to do a particular act (or acts) upon the land of another. It is a nonpossessory right to use the property as specified between the parties." (Friedman et al., Cal. Practice Guide: Landlord—Tenant, *supra*, ¶ 2:29, p. 2A-13 (rev. # 1, 2005), italics omitted; see, e.g., *Qualls v. Lake Berryessa Enterprises, Inc.* (1999) 76 Cal.App.4th 1277, 1283, 1284 [91 Cal.Rptr.2d 143] [right to maintain a recreation home on lands held by concessionaire of governmental entity was a license, not a tenancy]; *Von Goerlitz v. Turner* (1944) 65 Cal.App.2d 425, 429, 430 [150 P.2d 278] [right to operate a mine was a license, not a tenancy]; cf. *Beckett v. City of Paris Dry Goods Co., supra,* 14 Cal.2d at p. 637 [contract to operate the shoe department of a store created a tenancy, not a mere license].) "Unlike a tenancy, a license does not convey a possessory interest in land." (Cal. Practice Guide, ¶ 2:30, p. 2A-13 (rev. # 1, 2005), italics omitted.) "Whether a contract confers a mere license or instead creates a tenancy is a question of law." (*Id.*, ¶ 2:32, p. 2A-14 (rev. # 1, 2005).)

One key characteristic that distinguishes a tenancy from a mere license is the right to exclusive possession as against the whole world, including the landowner. (*San Jose Parking, Inc. v. Superior Court* (2003) 110 Cal.App.4th 1321, 1328 [2 Cal.Rptr.3d 505]; *Von Goerlitz v. Turner, supra,* 65 Cal.App.2d at p. 429.) Here, plaintiff made the factual assertion that the "lease agreement did not place any restrictions upon Plaintiff's occupancy at the Subject property." Defendants responded that the proffered fact was irrelevant, but they did not dispute it. In any event, there is no evidence in the record indicating that any person besides plaintiff had the right to occupy the apartment during the lease term. To the contrary, the housing agreement provides for plaintiff to "be housed individually" in the apartment. Thus, so far as this record suggests, plaintiff enjoyed exclusive possession of the premises during the term of the lease. (Cf. *San Jose Parking, Inc. v. Superior Court,* at p. 1328 [no exclusive possession where the contracting party was required to "provide reasonable access for pedestrian customers of the adjacent property owners"].)

---

[6] Defendants actually proffered these arguments in connection with plaintiff's claims for breach of contract and for trespass, respectively. But because defendants' arguments pertain to the issue at hand, we discuss them here.

Another "fundamental attribute of a lease" that distinguishes it from a license is payment "for the use of the premises" in the form of "the legal equivalent of rent." (*San Jose Parking, Inc. v. Superior Court, supra*, 110 Cal.App.4th at p. 1328.) In this case, there is evidence that plaintiff was housed at the apartment as part of her compensation. (*Tappe v. Lieberman, supra*, 145 Cal.App.3d at p. Supp. 24; cf. *Eichhorn v. De La Cantera, supra*, 117 Cal.App.2d at p. 54.) That is sufficient to raise a triable issue on the question of payment of rent or its legal equivalent.

These facts undermine defendants' argument that plaintiff was a mere licensee with no right to possession as a matter of law.

As a second ground for their assertion that plaintiff cannot have been in peaceable possession, defendants cite her knowing decision to continue residing in the employer-provided apartment despite termination of her employment. Defendants rely on *Chan v. Antepenko* (1988) 203 Cal.App.3d Supp. 21 [250 Cal.Rptr. 851]. That case states: "Discharged employees are not tenants. Their presence on the premises is not a possession or an occupancy, for these are retained by the owner; they are like guests or lodgers who, when their rights to remain has ceased, may be removed without notice." (*Id.* at p. Supp. 24.) The *Chan* case further states that "a licensee holding over after expiration of his license is a trespasser . . . ." (*Id.* at p. Supp. 26.)

Defendants' reliance on *Chan* is misplaced, for two reasons. First, *Chan* is factually distinguishable. That case did not involve landlord self-help. (*Chan v. Antepenko, supra*, 203 Cal.App.3d at p. Supp. 23.) Using available judicial remedies, the plaintiffs there "commenced an unlawful detainer action against defendant . . . seeking to recover possession" of the apartment that he had occupied first as their assistant manager and later as their manager. (*Id.* at pp. Supp. 22–23.) Furthermore, in *Chan*, the defendant had acknowledged that he was not a tenant but rather a licensee. (*Id.* at p. Supp. 23.) That is not our case. Second, to the extent that *Chan* suggests that any discharged employee may be dispossessed—without regard to the circumstances surrounding his occupancy and by means of the landlord's self-help—we reject that suggestion as contrary to the law of this state.

Long-standing authority undercuts defendants' argument on this point. As has been said, where a party's "possession arose by virtue of . . . employment" that was later terminated, and where the party "never himself abandoned or surrendered the possession of the premises so acquired, . . . he could not be guilty of forcible entry merely for the reason that the [employer] had declared his contract at an end and therefore his right to the actual possession of the property forfeited." (*San Francisco etc. Soc. v. Leonard* (1911) 17 Cal.App. 254, 262 [119 P. 405].)

 The terminated employee's refusal to vacate thus "does not constitute proof that he was not in actual possession, peaceably obtained . . . ." (*San Francisco etc. Soc. v. Leonard, supra*, 17 Cal.App. at p. 263.)

### b. *Defendants' forcible entry*

"Indeed, to the contrary, if, under such circumstances, the [employer] had forcibly driven [the terminated employee] from the premises and thus taken possession thereof, it would itself have been guilty of forcible entry, although it might transpire . . . that, as a matter of legal right, it was entitled to the possession. This proposition necessarily follows from the very theory upon which or the purpose for which the forcible entry and forcible and unlawful detainer statute is enacted, viz., to secure a judicial adjustment of differences of that character and thus prevent the parties themselves from redressing or attempting to redress their own wrongs which is likely to lead to serious wrongs against the public or society." (*San Francisco etc. Soc. v. Leonard, supra*, 17 Cal.App. at p. 262, italics omitted; accord, *Eichhorn v. De La Cantera, supra*, 117 Cal.App.2d at pp. 56–57.)

By dispossessing plaintiff without resort to judicial process, defendants exposed themselves to potential tort liability for wrongful eviction. (*Daluiso v. Boone, supra*, 71 Cal.2d at p. 486.) By changing the locks, defendants exposed themselves to potential tort liability for forcible entry. (*Jordan v. Talbot, supra*, 55 Cal.2d at p. 605; *Lamey v. Masciotra, supra*, 273 Cal.App.2d at p. 715; *Karp v. Margolis, supra*, 159 Cal.App.2d at p. 73.)

For all the foregoing reasons, it was improper to summarily adjudicate this claim.

### B. *Trespass*

 "The essence of the cause of action for trespass is an 'unauthorized entry' onto the land of another. Such invasions are characterized as intentional torts, regardless of the actor's motivation." (*Civic Western Corp. v. Zila Industries, Inc.* (1977) 66 Cal.App.3d 1, 16 [135 Cal.Rptr. 915].)

### 1. *Protection of the plaintiff's possessory right*

"The cause of action for trespass affords protection for a possessory, not necessarily an ownership interest." (*Allen v. McMillion* (1978) 82 Cal.App.3d 211, 218 [147 Cal.Rptr. 77].) For that reason, the plaintiff need not have legal rights in the land. (*Id.* at p. 214.) Even "one in peaceable though wrongful possession of real property may sue in tort for forcible interference with that possession even in the absence of injury to his person or goods . . . ." (*Ibid.*)

Furthermore, "the fact that a defendant may have title or the right to possession of the land is no defense." (*Id.* at pp. 218–219.)

The conduct alleged in this case could support recovery under a trespass theory, as the factually similar *Civic Western* case makes clear. In *Civic Western*, defendant Zila cross-complained on several theories, including trespass. (*Civic Western Corp. v. Zila Industries, Inc., supra*, 66 Cal.App.3d at p. 7.) "Zila alleged that . . . agents of Civic had wrongfully taken possession of Zila's premises in Inglewood by ejecting Zila's employees from those premises and changing the locks on the doors." (*Ibid.*, fn. omitted.) "Regardless of the actual circumstances of this event, no one denies that Zila's officers and employees were prevented from remaining on Zila's premises, and that the officers were prevented from access to their personal records. This precludes the granting of a summary judgment on these causes of action." (*Id.* at p. 18.)

### 2. *Consent as a defense*

■ Nor have defendants demonstrated their entitlement to summary judgment based on consent. To be sure, consent obviates the tort: "Where there is a consensual entry, there is no tort, because lack of consent is an element of the wrong." (*Civic Western Corp. v. Zila Industries, Inc., supra*, 66 Cal.App.3d at pp. 16–17; see 5 Witkin, Summary of Cal. Law, *supra*, Torts, § 696, pp. 1021–1022.) In this case, however, the factual issue of whether plaintiff consented to the entry is disputed. And as explained above, Mobile's "consent" is irrelevant. (*Brown Derby Hollywood Corp. v. Hatton, supra*, 61 Cal.2d at p. 858 ["consent of the landowner to the encroachment cannot prevent the tenant from asserting his rights . . ."].) Thus, the defense of consent was not established here as a matter of law.

### C. *Invasion of Privacy*

■ Plaintiff alleges both intentional and negligent invasion of privacy. California law makes no distinction between the two, however. "The motives of a person charged with invading the right are not material with respect to the determination whether there is a right of action, and malice is not an essential element of a violation of the right." (*Fairfield v. American Photocopy etc. Co.* (1955) 138 Cal.App.2d 82, 87 [291 P.2d 194].) We thus discuss these two causes of action together.

### 1. *Legal principles*

■ While invasion of privacy takes several forms, "the tort of intrusion into private places, conversations or matter is perhaps the one that best

captures the common understanding of an 'invasion of privacy.' It encompasses unconsented-to physical intrusion into the home, hospital room or other place the privacy of which is legally recognized . . . ." (*Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 230–231 [74 Cal.Rptr.2d 843, 955 P.2d 469].) "It is in the intrusion cases that invasion of privacy is most clearly seen as an affront to individual dignity." (*Id.* at p. 231.)

The cause of action "for intrusion has two elements: (1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person." (*Shulman v. Group W Productions, Inc., supra*, 18 Cal.4th at p. 231.) "To prove actionable intrusion, the plaintiff must show the defendant penetrated some zone of physical or sensory privacy surrounding . . . the plaintiff. The tort is proven only if the plaintiff had an objectively reasonable expectation of seclusion or solitude in the place . . ." or zone. (*Id.* at p. 232.)

### 2. *Application*

Addressing the first element of the cause of action, defendants assert that plaintiff had no reasonable expectation of privacy in the apartment, since she consented to the entry and since her boxes were already packed and she was ready to move out. According to defendants, "at the time the lock was changed, the apartment was no longer a private place or a home and entry by anyone would not have been an invasion of privacy."

We cannot agree with defendants that this point has been established as a matter of law. As explained above, assuming that plaintiff establishes herself as a hirer of the property, she would have the right to peaceful possession of the apartment. Under that scenario, the apartment was still plaintiff's home at the time that the locks were changed, with the concomitant right to privacy there. (Cf. *Shulman v. Group W Productions, Inc., supra*, 18 Cal.4th at p. 232 [accident victims "had no right of ownership or possession of the property where the rescue took place, nor any actual control of the premises"].)

As for the second element, a jury could find defendants' conduct here "highly offensive to a reasonable person." (*Shulman v. Group W Productions, Inc., supra*, 18 Cal.4th at p. 231.) The record thus fails to support summary adjudication for defendants as to plaintiff's tort claim for invasion of privacy.

### D. *Infliction of Emotional Distress*

Plaintiff's complaint asserts claims for both negligent and intentional infliction of emotional distress (the first and second causes of action). Negligent infliction of emotional distress does not exist as an independent

tort. (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 984 [25 Cal.Rptr.2d 550, 863 P.2d 795].) The tort is simply negligence. (*Ibid.*) We therefore confine our discussion at this juncture to plaintiff's intentional tort claim.

### 1. *Legal principles*

The elements of the tort of intentional infliction of emotional distress are (1) extreme and outrageous conduct by the defendant; (2) extreme or severe emotional distress to the plaintiff; and (3) actual and proximate causation between the two. (*Potter v. Firestone Tire & Rubber Co., supra,* 6 Cal.4th at p. 1001.) To be outrageous, the defendant's conduct must be either intentional or reckless, and it must be so extreme as to exceed all bounds of decency in a civilized community. (*Ibid.*) Furthermore, that conduct must be specifically directed at the plaintiff. (*Id.* at p. 1002.) Malicious or evil purpose is not essential to liability, however. (*KOVR-TV, Inc. v. Superior Court* (1995) 31 Cal.App.4th 1023, 1031 [37 Cal.Rptr.2d 431].) In the usual case, outrageousness is a question of fact. (*Angie M. v. Superior Court* (1995) 37 Cal.App.4th 1217, 1226 [44 Cal.Rptr.2d 197]; *Trerice v. Blue Cross of California* (1989) 209 Cal.App.3d 878, 883 [257 Cal.Rptr. 338].)

### 2. *Application*

According to defendants, the first element of the claim can be resolved as a matter of law in this case, since there is "simply no evidence" of outrageous conduct here. In defendants' view, their conduct cannot be considered outrageous, as it amounted to nothing more than "changing the lock of an apartment at the request of [their] tenant, Mobile Medical, after [plaintiff's employment] assignment was terminated."

We reject defendants' contention that they have established lack of outrageousness as a matter of law.

First, as a general principle, changing the locks on someone's dwelling without consent to force that person to leave is prohibited by statute. (See Civ. Code, § 789.3, subd. (b)(1) [forbidding landlords from changing locks to terminate occupancy].) Though defendants' agents were polite and sympathetic towards plaintiff, they nevertheless caused her to leave her home without benefit of judicial process. As stated in *Richardson v. Pridmore*: "While in the present case no threats or abusive language were employed, and no violence existed, that is not essential to the cause of action. An eviction may, nevertheless, be unlawful even though not accompanied with threats, violence or abusive language. Here the eviction was deliberate and

intentional. The conduct of defendants was outrageous. They must be held responsible for the damages caused by their deliberate and intentional acts." (*Richardson v. Pridmore, supra*, 97 Cal.App.2d at p. 130.)

Furthermore, as defendants' onsite property manager testified, she was "concerned . . . about the legality" of changing the locks at Mobile's request. She had "been trained that changing locks with the intent to terminate a resident's right to occupy their home is illegal" but she "didn't think [she] was doing that here." The fact that the manager proceeded despite those concerns bears on the disputed question of outrageousness. In short, the "evidence does not as a matter of law dispel a reasonable inference of actionable intent." (*KOVR-TV, Inc. v. Superior Court, supra*, 31 Cal.App.4th at p. 1031.)

██ Additionally, the record demonstrates that plaintiff was particularly vulnerable at the time of defendants' unlawful entry. She returned home after reconstructive surgery, with her arm in a cast. The very next day, plaintiff received notification that Mobile wanted her out of the premises. The day after that, she was gone from the apartment. Plaintiff told defendants' employees "that she was seriously injured and under doctors' orders to use her arm as little as possible. She informed them that she had been terminated from her employment and had no[] other place to reside." And defendants' onsite property manager acknowledged that she was "concerned" for plaintiff's "welfare" when asked to change the locks. This evidence of vulnerability is relevant in considering whether defendants acted outrageously. (Cf. *Symonds v. Mercury Savings & Loan Assn.* (1990) 225 Cal.App.3d 1458, 1469 [275 Cal.Rptr. 871] [debt collectors' actions "may rise to the level of outrageous conduct where the creditor knows the debtor is susceptible to emotional distress because of her physical or mental condition"].)

For all these reasons, defendants have not established lack of outrageousness as a matter of law. Plaintiff's cause of action for intentional infliction of emotional distress should not have been summarily adjudicated.

### E. *Negligence*

#### 1. *Legal principles*

██ "Actionable negligence is traditionally regarded as involving the following: (1) a legal duty to use due care; (2) a breach of that duty; and (3) the breach as the proximate or legal cause of the resulting injury." (6 Witkin, Summary of Cal. Law, *supra*, Torts, § 835, p. 52.)

The first element, duty, "may be imposed by law, be assumed by the defendant, or exist by virtue of a special relationship." (*Potter v. Firestone*

*Tire & Rubber Co., supra*, 6 Cal.4th at p. 985.) The existence of a legal duty "is a question of law to be resolved by the court." (*Bily v. Arthur Young & Co., supra*, 3 Cal.4th at p. 397; accord, *Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 614 [76 Cal.Rptr.2d 479, 957 P.2d 1313].) "In the usual negligence case," the other two elements "present questions of fact for the jury." (6 Witkin, Summary of Cal. Law, *supra*, Torts, § 886, p. 93.)

### 2. *Application*

Defendants make a two-pronged argument in support of summary adjudication of plaintiff's negligence claim, asserting (a) their lack of duty and (b) the absence of evidence that their conduct was a substantial factor in causing any harm to plaintiff. Neither persuades us that defendants are entitled to judgment as a matter of law on this claim.

### a. *Duty*

Defendants first argue that they owed plaintiff no legal duty, because she was not their tenant. That argument misses the point. As discussed above, the law imposes a duty on landlords not to disturb an occupant's possession except by legal process. (Code Civ. Proc., §§ 1159, 1160; *Jordan v. Talbot, supra*, 55 Cal.2d at pp. 604, 605.) Plaintiff has proffered evidence that she was an occupant of the property as statutorily defined. Proof of that status gives rise to a legal duty on defendants' part, imposed by law. (Cf. *Potter v. Firestone Tire & Rubber Co., supra*, 6 Cal.4th at p. 985 [defendant was subject to "a duty imposed on it by law and regulation"].)

Nor can defendants avoid tort liability as a matter of law on the ground that they merely complied with instructions from Mobile. (Cf. *Barkett v. Brucato* (1953) 122 Cal.App.2d 264, 273 [264 P.2d 978] [rejecting the landlord's claim that she could not "be held liable at all on the second cause of action for negligence . . . because the only negligence . . . shown was that of the contractors"].) As they did in defense of plaintiff's contract claims, defendants assert that "refusal to follow Mobile Medical's instruction regarding changing the lock would arguably have breached [their] duty to Mobile Medical with respect to [its] right to quiet use and enjoyment of the premises." That assertion reflects a fundamental misunderstanding of plaintiff's rights as an asserted hirer of the dwelling unit, which include "the quiet possession of the thing hired during the term of the hiring, against *all persons* lawfully claiming the same." (Civ. Code, § 1927, italics added.) It also reflects disregard for the law's strong policy against self-help in resolving disputed claims to possession of real property.

In short, defendants have not established the absence of duty as a matter of law.

### b. *Harm*

Alternatively, defendants assert, any breach of duty on their part was not a substantial factor in causing harm to plaintiff since "she had already substantially moved out and relinquished her occupancy by that time."

 However, as plaintiff correctly observes, relinquishment is ordinarily a question of fact. "While abandonment is a matter of intent which may be proved by the acts and conduct of the party who is alleged to have abandoned the property in controversy, a finding of abandonment must be based upon evidence from which an inference of abandonment can reasonably be drawn." (*Pickens v. Johnson* (1951) 107 Cal.App.2d 778, 788 [238 P.2d 40]; see also, e.g., *Kassan v. Stout* (1973) 9 Cal.3d 39, 43 [106 Cal.Rptr. 783, 507 P.2d 87] ["abandonment is a question of fact for the trial court . . ."]; *Martin v. Cassidy* (1957) 149 Cal.App.2d 106, 112 [307 P.2d 981] [there was "substantial evidence to support the court's finding of abandonment"].)

In this case, according to the undisputed facts, plaintiff communicated to defendants' agents "a strong desire not to leave the premises." "On the day of the lock-out she was visibly upset and distraught." Plaintiff declared: "I was provided no choice with regard to the removal of my furniture and the changing of my locks." She further declared: "I had no way to prevent [defendants] from committing these acts." These facts support an inference that plaintiff had not voluntarily relinquished her occupancy. This record also supports the further inference that plaintiff would not have been in the process of moving out at all, if not for defendants' stated intent to change the lock on her apartment.

For all these reasons, summary adjudication of plaintiff's negligence claim is improper.

## V. *Statutory Claims*

Beyond her contract and tort claims, plaintiff's complaint asserts two statutory causes of action: illegal entry in violation of Civil Code section 1954 (10th cause of action) and lockout in violation of Civil Code section 789.3 (11th cause of action).

As with plaintiff's other claims, the trial court summarily adjudicated her statutory causes of action based on its determination that plaintiff was not defendants' tenant.

As explained above, however, a person in peaceful possession of a residential dwelling need not be a "tenant" to be protected under the relevant

statutes. Moreover, defendants have not otherwise established their entitlement to judgment as a matter of law on either of plaintiff's statutory claims. We briefly address those points now.

### A. Civil Code section 1954

■ Civil Code section 1954 limits a landlord's right to enter an occupied residential dwelling. Civil penalties may be imposed for "a significant and intentional violation" of section 1954, if done "for the purpose of influencing a tenant to vacate a dwelling . . . ." (Civ. Code, § 1940.2, subd. (a)(4); see *id.*, subd. (b) [penalties].)

#### 1. Application to plaintiff

Section 1954 is part of division 3, part 4, title 5, chapter 2, of the Civil Code. (Civ. Code, § 1940 et seq.) As explained above, that chapter governs those who "hire" residential real property, which generally includes "all persons who hire dwelling units located within this state including tenants, lessees, boarders, lodgers, and others, however denominated." (Civ. Code, § 1940, subd. (a); see *id.*, subd. (b) [exceptions for transient hotel guests]; see generally Friedman et al., Cal. Practice Guide: Landlord—Tenant, *supra*, ¶¶ 2:36 to 2:40.1, pp. 2A-17 to 2A-19.) The statute defines "dwelling unit" as "a structure or the part of a structure that is used as a home, residence, or sleeping place by one person who maintains a household or by two or more persons who maintain a common household." (Civ. Code, § 1940, subd. (c).)

Applying these statutory definitions to the evidentiary record, plaintiff has raised a triable issue that Civil Code section 1954 applies to her, since she arguably "hired" and indisputably occupied the "dwelling unit" at issue here. We therefore reject defendants' assertion that, as a matter of law, plaintiff "does not qualify as a tenant and cannot rely on this code section."

#### 2. Facts precluding defense summary judgment

■ Civil Code section 1954 forbids the landlord from entering a dwelling, except in specified circumstances. Those circumstances include cases where "the tenant has abandoned or surrendered the premises." (Civ. Code, § 1954, subd. (a)(3).) In such cases, the landlord may enter without giving notice. (*Id.*, subd. (e)(3).) Notice is also unnecessary when "the tenant is present and consents to the entry at the time of entry." (*Id.*, subd. (e)(2).)

It is undisputed that defendants entered plaintiff's dwelling unit and changed the locks. Whether plaintiff consented to the entry and whether she voluntarily relinquished her occupancy of the premises are disputed questions of fact.

Defendants nevertheless argue that they were not in violation of this statute, because they were acting on instructions from Mobile, their tenant.

We disagree, for at least two reasons.

For one thing, as discussed above, the record could support a determination that defendants' actions constitute improper self-help. "Regardless of who has the right to possession, orderly procedure and preservation of the peace require that the actual possession shall not be disturbed except by legal process." (*Jordan v. Talbot, supra*, 55 Cal.2d at p. 605.) Resort to legal process is required, even where the occupant "is technically a trespasser." (5 Witkin, Summary of Cal. Law, *supra*, Torts, § 421, p. 636.) Even with the right to possession, an employer is "guilty of forcible entry" by using self-help to oust a terminated employee who is holding over. (*San Francisco etc. Soc. v. Leonard, supra*, 17 Cal.App. at p. 262.) For that reason, we cannot agree that Mobile's directives justify defendants' actions.

 Moreover, it is plain that the statute is intended to protect people, such as plaintiff, who are actually living in the dwelling. (Cf. *Tappe v. Lieberman, supra*, 145 Cal.App.3d at p. Supp. 24 [ordinance was designed to protect "the 'real tenants,' those who actually reside in the rooms and pay their rent in the form of in lieu wages"].) Defendants thus have not shown as a matter of law that Mobile's directives overcome plaintiff's statutory rights to reside in the dwelling free of unlawful entry.

B. *Civil Code section 789.3*

Civil Code section 789.3 protects those occupying residential premises from specified actions by the landlord, including changing the locks, which are done with the intent to oust the resident. The parties disagree about whether plaintiff falls within the statute's protections.

1. *Application to plaintiff*

An analysis of the statutory language reveals that Civil Code section 789.3 applies to plaintiff's occupancy.

 First, and most importantly, plaintiff falls within the statute's broad reach. Painting with a broad brush, the statute forbids landlords' use of self-help "to terminate the *occupancy* under *any lease or other tenancy* or estate at will, *however created*, of property used by a tenant as his or her residence" by means of changing the locks, removing outside doors or windows, or removing the resident's personal property. (Civ. Code, § 789.3,

subd. (b), italics added.)[7] Plaintiff is a named "occupant" under the extension of the lease at issue here. And as our high court has explained in connection with subdivision (c) of the statute, the word " 'tenant' as used in the penalty formula of section 789.3 refers to all the occupants of a rental unit." (*Kinney v. Vaccari* (1980) 27 Cal.3d 348, 358 [165 Cal.Rptr. 787, 612 P.2d 877].)

 Additionally, plaintiff's situation does not fall within the statute's explicit exception for "occupancies defined by subdivision (b) of Section 1940." (Civ. Code, § 789.3, subd. (b)(3).) As explained above, the excepted occupancies are for transient hotel guests. (Civ. Code, § 1940, subd. (b).) But plaintiff is not such a person; rather, she is in the statutory category that includes "tenants, lessees, boarders, lodgers, and others, however denominated." (*Id.*, subd. (a).)

### 2. *Facts precluding defense summary judgment*

Defendants do not repeat their arguments that their conduct was justified. Those arguments would be unpersuasive in any event for the reasons discussed above. First, there is evidence in this record that defendants engaged in self-help. "The manifest purpose of section 789.3 is to discourage landlords from using self-help." (*Otanez v. Blue Skies Mobile Home Park* (1991) 1 Cal.App.4th 1521, 1525 [3 Cal.Rptr.2d 210].) Second, the statute is apparently designed to protect people actually residing in the dwelling place. (Cf. *Tappe v. Lieberman, supra*, 145 Cal.App.3d at p. Supp. 24 [ordinance protecting such people].)

Under the circumstances present here, defendants are not entitled to judgment as a matter of law on plaintiff's statutory claims.

## VI. *Punitive Damage Claims*

Plaintiff asserted entitlement to punitive damages in connection with her claims for breach of the covenant of good faith and fair dealing, intentional infliction of emotional distress, wrongful eviction, trespass, invasion of privacy, and violation of Civil Code section 1954. Punitive damages are authorized by Civil Code section 3294.[8]

Defendants sought summary adjudication of plaintiff's punitive damage claims. (Code Civ. Proc., § 437c, subd. (f)(1); *Myers v. Trendwest Resorts, Inc.*

---

[7] In subdivision (a), a similarly worded provision prohibits landlords from terminating residential occupancy by interrupting utility services. (Civ. Code, § 789.3, subd. (a).) Though Mobile also asked defendants to cut off plaintiff's utilities, they refused to do so, citing the illegality of the request.

[8] In pertinent part, that statute provides: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages,

(2007) 148 Cal.App.4th 1403, 1435–1436 [56 Cal.Rptr.3d 501].) Defendants argued: (1) there was no basis for punitive damages since plaintiff could not "maintain an action against any of the moving defendants on those causes of action," and (2) there was "no evidence of any conduct by defendants amounting to oppression, fraud, or malice as required" by the governing statute. They renew those arguments here.

In her opposition papers below, plaintiff responded to defendants' contentions. Plaintiff implicitly conceded the first point. (See *Myers v. Trendwest Resorts, Inc., supra,* 148 Cal.App.4th at p. 1435 ["affirmance of summary adjudication in favor of [defendant] regarding the common law counts defeats plaintiff's claim for punitive damages on those counts"].) Addressing defendants' second point, she stated: "With respect to the clear and convincing standard for punitive damages, it is not plaintiff's obligation to prove her claim in opposing a motion for summary adjudication. It is only necessary to provide a prima facie showing of facts to sustain a favorable decision if the evidence submitted is believed." (See *American Airlines, Inc. v. Sheppard, Mullin, Richter · & Hampton* (2002) 96 Cal.App.4th 1017, 1049 [117 Cal.Rptr.2d 685] [the plaintiff is not required "to 'prove' a case for punitive damages at summary judgment"].) On appeal, plaintiff maintains those positions. As to the first point, she acknowledges: "If the Court were correct in granting the motion, of course, there would be no basis for such damages." Addressing the second point, plaintiff asserts "the existence of triable issues of fact concerning whether defendants' conduct was malicious and/or oppressive."

A. *Legal Principles*

 As the California Supreme Court long ago explained: " 'Exemplary or punitive damages are not recoverable as matter of right. Their allowance rests entirely in the discretion of the jury, and they may be awarded only where there is some evidence of fraud, malice, express or implied, or oppression.' " (*Clark v. McClurg* (1932) 215 Cal. 279, 282 [9 P.2d 505].) "Since the 1987 amendments to Civil Code section 3294, oppression, fraud, or malice must be proven by 'clear and convincing' evidence." (*American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton, supra,* 96 Cal.App.4th at p. 1049.)

1. *Malice requirement*

 For purposes of awarding punitive damages, malice is statutorily defined as either "conduct which is intended by the defendant to cause injury

may recover damages for the sake of example and by way of punishing the defendant." (Civ. Code, § 3294, subd. (a).) The statute also defines malice, oppression, and fraud. (*Id.,* subd. (c).)

to the plaintiff," or "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1); see *American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton, supra,* 96 Cal.App.4th at p. 1050.)

### 2. *Proving malice*

 In the usual case, the question of whether the defendant's conduct will support an award of punitive damages is for the trier of fact, "since the degree of punishment depends on the peculiar circumstances of each case." (*Hannon Engineering, Inc. v. Reim* (1981) 126 Cal.App.3d 415, 431 [179 Cal.Rptr. 78]; see also, e.g., *Nippon Credit Bank v. 1333 North Cal. Boulevard* (2001) 86 Cal.App.4th 486, 501 [103 Cal.Rptr.2d 421] ["entitlement to punitive damages is generally an issue for the trier of fact . . ."].)

But the issue may be resolved on summary judgment, giving due regard to the higher proof standard. While "the 'clear and convincing' evidentiary standard is a stringent one, it does not impose on a plaintiff the obligation to 'prove' a case for punitive damages at summary judgment." (*American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton, supra,* 96 Cal.App.4th at p. 1049.) "However, where the plaintiff's ultimate burden of proof will be by clear and convincing evidence, the higher standard of proof must be taken into account in ruling on a motion for summary judgment or summary adjudication, since if a plaintiff is to prevail on a claim for punitive damages, it will be necessary that the evidence presented meet the higher evidentiary standard." (*Ibid.*; see also, e.g., *Basich v. Allstate Ins. Co.* (2001) 87 Cal.App.4th 1112, 1121 [105 Cal.Rptr.2d 153]; cf. *Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 59 [29 Cal.Rptr.2d 615] [a nonsuit on punitive damages is not "necessarily proper whenever the court deems the plaintiff's evidence less than clear and convincing" (italics omitted)].) But as with a judgment of nonsuit, summary judgment "on the issue of punitive damages is proper" only "when no reasonable jury could find the plaintiff's evidence to be clear and convincing proof of malice, fraud or oppression." (*Hoch v. Allied-Signal, Inc.,* at pp. 60–61.)

### B. *Application*

 "The presence or absence of oppression or malice must be analyzed and weighed in the light of the rights of the respective parties." (*Farmy v. College Housing, Inc.* (1975) 48 Cal.App.3d 166, 174 [121 Cal.Rptr. 658] [no punitive damages for claimed nuisance by adjoining landowners, where they complied with all ordinances and regulations].) At issue here are the parties'

rights and obligations arising out of plaintiff's occupancy of the apartment. As we explain, in light of controlling legal authority, plaintiff cannot state a punitive damages claim in connection with her fourth cause of action, for breach of the covenant of good faith and fair dealing. But the facts could support punitive damages on other causes of action for which they are sought.

### 1. *Breach of the covenant of good faith and fair dealing*

 "Because the covenant of good faith and fair dealing essentially is a contract term that aims to effectuate the contractual intentions of the parties, 'compensation for its breach has almost always been limited to contract rather than tort remedies.' " (*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 43 [86 Cal.Rptr.2d 855, 980 P.2d 407].) The California Supreme Court "recognizes only one exception to that general rule: tort remedies are available for a breach of the covenant in cases involving insurance policies." (*Ibid.*) "In the insurance policy setting, an insured may recover . . . punitive damages if there has been oppression, fraud, or malice by the insurer (see Civ. Code, § 3294)." (*Id.* at pp. 43–44.) "In the area of insurance contracts the covenant of good faith and fair dealing has taken on a particular significance, in part because of the special relationship between the insurer and the insured." (*Jonathan Neil & Assoc., Inc. v. Jones* (2004) 33 Cal.4th 917, 937 [16 Cal.Rptr.3d 849, 94 P.3d 1055].)

Thus, "with the exception of bad faith insurance cases, a breach of the covenant of good faith and fair dealing permits a recovery solely in contract." (*Fairchild v. Park* (2001) 90 Cal.App.4th 919, 927 [109 Cal.Rptr.2d 442].) For example, the California Supreme Court has "refused to extend the tort of bad faith to the employment relationship, concluding that it was substantially different from the insurance relationship." (*Jonathan Neil & Assoc., Inc. v. Jones, supra,* 33 Cal.4th at p. 938, citing *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373].) In part, that position is based on the recognition that "traditional tort remedies may be available" for misconduct arising in other types of relationships. (*Jonathan Neil & Assoc., Inc. v. Jones,* at p. 939.)

Since a party "may not recover in tort for . . . breach of the implied covenant of good faith and fair dealing," an "award of punitive damages" is not permitted on such a claim. (*Cates Construction, Inc. v. Talbot Partners, supra,* 21 Cal.4th at p. 61.)

As the foregoing authority makes clear, in noninsurance cases such as this one, breach of the implied covenant of good faith and fair dealing will not

give rise to punitive damages. Any policy arguments for extension to other contexts are properly directed to the Legislature, not to this court.

### 2. *Plaintiff's other causes of action*

In contrast to plaintiff's contract-based claim, punitive damages may be available for the torts of wrongful eviction, trespass, invasion of privacy, and intentional infliction of emotional distress.

■ All of these causes of action arose out of the same set of facts, involving the claim that defendants disrupted plaintiff's peaceful occupation of the premises. As long-standing authority makes clear, punitive damages may be awarded in an action by a residential tenant based on the landlord's interference with peaceful possession. (*Tooke v. Allen* (1948) 85 Cal.App.2d 230, 236, 239 [192 P.2d 804].) Punitive damages likewise are recoverable for retaliatory eviction and for the infliction of emotional distress. (*Aweeka v. Bonds* (1971) 20 Cal.App.3d 278, 281–282 [97 Cal.Rptr. 650].) Causes of action "for forcible entry and detainer" and for "trespass also support the award of exemplary damages." (*Cyrus v. Haveson* (1976) 65 Cal.App.3d 306, 316 [135 Cal.Rptr. 246].)

"To support punitive damages, the complaint asserting one of those causes of action must allege ultimate facts of the defendant's oppression, fraud, or malice." (*Cyrus v. Haveson, supra,* 65 Cal.App.3d at pp. 316–317.) A claim "for exemplary damage may be supported by pleading that the wrong was committed willfully or with a design to injure." (*G. D. Searle & Co. v. Superior Court* (1975) 49 Cal.App.3d 22, 29 [122 Cal.Rptr. 218].) The claim may also be supported by showing "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).) "To establish conscious disregard, the plaintiff must show 'that the defendant was aware of the probable dangerous consequences of his conduct, and that he wilfully and deliberately failed to avoid those consequences.' " (*Hoch v. Allied-Signal, Inc., supra,* 24 Cal.App.4th at p. 61.) Conversely, punitive damages are not allowed in the absence of factual allegations "that defendants intentionally, as opposed to negligently or mistakenly, disregarded plaintiff's right to possession or were aware that she had not received a notice to quit." (*Cyrus v. Haveson,* at p. 317.)

In this case, plaintiff argues, defendants' acts were willful. Although "not accompanied with threats, violence or abusive language . . . the eviction was deliberate and intentional." (*Richardson v. Pridmore, supra,* 97 Cal.App.2d at p. 130.) Such conduct may be considered "outrageous." (*Ibid.*) Moreover, there is evidence that defendants' acts in dispossessing plaintiff were carried

out despite concerns about the legality of the acts and about their effect on plaintiff's welfare. Given this factual scenario, a reasonable jury could find that defendants acted with conscious disregard for plaintiff's rights. (Cf. *Ramona Manor Convalescent Hospital v. Care Enterprises* (1986) 177 Cal.App.3d 1120, 1142 [225 Cal.Rptr. 120] ["evidence was sufficient to support an award of punitive damages" based on defendant's "unjustified and unprivileged" holding over, which "consciously disregarded" new lessee's rights to possession].)

In sum, on this record, there remains a triable issue on the question of whether defendants acted with malice. Thus the availability of punitive damages arising from plaintiff's tort claims should not be summarily adjudicated.

## VII. *Attorney Fee Award*

The trial court awarded defendants their costs, including attorney fees. The basis for the fee award was Civil Code section 789.3. In pertinent part, that statute provides: "In any action under subdivision (c) the court shall award reasonable attorney's fees to the prevailing party." (Civ. Code, § 789.3, subd. (d).) One of plaintiff's causes of action was brought under subdivision (c).

On appeal, plaintiff asserts: "Since the granting of summary judgment was error, the award of attorney fees cannot stand, as [defendants] are not prevailing parties." (See *Webber v. Inland Empire Investments, Inc.* (1999) 74 Cal.App.4th 884, 912, 917 [88 Cal.Rptr.2d 594] [cross-appellant challenged "the grant of attorney fees by attacking the trial court's decision" to summarily adjudicate one cause of action].) In any event, plaintiff contends: "The fee provisions of Civil Code § 789.3 should not apply under these circumstances."

Defendants take issue with plaintiff's second point. Under the statute, they argue, "an award of attorney's fees to the prevailing party is mandatory, not discretionary."

 In this case—or at least at this juncture in the case—we need not address the reach of the statute. Where summary judgment is reversed on appeal, there is no prevailing party and thus no basis for an award of fees. (*Rich v. Schwab* (1984) 162 Cal.App.3d 739, 745 [209 Cal.Rptr. 417] ["order awarding Landlord costs and attorney fees under Civil Code section 1942.5, subdivision (g) is vacated, there being no prevailing party at this stage"].) Since we reverse, the fee award cannot stand.

## DISPOSITION

We reverse the February 2007 summary judgment for defendants, as well as the May 2007 judgment awarding defendants attorney fees and costs. Plaintiff shall have costs on appeal.

Bamattre-Manoukian, Acting P. J., and Duffy, J., concurred.