Filed 1/30/15  Dousette v. Minidis CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MARY DOUSETTE et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> JAMES D. MINIDIS et al., <br><br> Defendants and Respondents. | B247436 <br><br> (Los Angeles County <br> Super. Ct. No. BC257079) |

      APPEAL from a judgment of the Superior Court of Los Angeles County, Mel Red Recana, Judge.  Affirmed.

      Craig A. Huber for Plaintiffs and Appellants.

      Klein & Wilson and Gerald A. Klein for Defendants and Respondents.

_____

Plaintiffs, Mary Dousette (Mary) and Michael Marsh (Michael), appeal from a judgment entered against them after the trial court granted summary judgment against Michael on his breach of contract, fraud and conversion claims, and the jury returned a verdict on Mary's breach of contract, promissory fraud, concealment, and conversion claims in favor of defendants, James D. Minidis (James) and Lynn Minidis (Lynn).[1] Plaintiffs contend that the trial court erred in granting summary judgment against Michael for lack of standing. Plaintiffs do not assert any ground for reversal of the judgment against Mary independent of Michael's assertion that the trial court erred in effectively eliminating him from the trial.

We affirm the judgment because the trial court properly determined Michael lacked standing. Even if, arguendo, the trial court erred, the error was harmless because Michael was in privity with Mary and thus bound by the jury's verdict in favor of defendants, and because the evidence and jury instructions demonstrate that the jury had ample information about Michael's significant involvement in the transactions giving rise to the instant case.

## BACKGROUND

**The complaint and first trial**

Plaintiffs filed this action on August 28, 2001, against defendants as well as Café Concepts, Inc. (Café Concepts), California Tortilla Fresh, Inc. (Tortilla Fresh), California Pride Foods, Inc., and Rick Armstrong (Armstrong).[2] Mary and Michael are married and James and Lynn are married. Armstrong provided tax services to James and Lynn and to the corporate defendants.

The complaint alleged that in 1996, plaintiffs, defendants, and Armstrong began negotiations to own and run a number of franchise stores based on a "concept-style" food

---

[1] We use first names to prevent confusion because some of the parties have the same last name. By doing so, we mean no disrespect.

[2] The trial proceeded against James and Lynn only because plaintiffs requested defaults against the corporate defendants in November 2001 and a dismissal without prejudice as to Armstrong in March 2004.

operation, which had been developed by James. The parties formed Tortilla Fresh in 1996 for this purpose pursuant to an agreement, which called for the opening of five corporate locations. Pursuant to the 1996 agreement, Mary was required to obtain financing and serve as vice-president and a director of the corporation. Mary and Michael further alleged that they provided $150,000 of their own money, as well as funds from other third parties through Mary's efforts. Because of his expertise in operating franchises, James was the corporation's president and a director, and assumed primary responsibility for overseeing franchise operations. Armstrong was the operations manager.

In 1997, the parties entered into a second agreement, which "was intended to super[s]ede" the prior agreement, and changed the corporation's name to Café Concepts. The 1997 agreement substituted Lynn as vice-president of the corporation in place of Mary, and delineated ownership of the stock, giving 51 percent to James, 39 percent to Mary, and 10 percent to Armstrong. The 1997 agreement required Mary to make an additional cash infusion of $155,000 to the business venture. At all relevant times, Armstrong served as the corporation's chief financial officer and a director.

Plaintiffs alleged that they ultimately contributed over $320,000 to the business, which James converted; James then refused to provide an accounting for the funds. Plaintiffs initially sued for breach of contract, fraud, conspiracy, conversion, breach of fiduciary duty, violation of shareholder's rights, and an accounting, although as noted below, they dismissed some of those claims later on.

The matter was initially tried by a jury, which rendered a verdict in plaintiffs' favor and against James and Lynn in the amount of $6.2 million. The trial court subsequently granted a new trial motion on grounds of irregularity in the proceedings and surprise, which order this Division upheld in 2008. (*Dousette v. Café Concepts, Inc.* (Nov. 19, 2008, B188118) [nonpub. opn.].)[3]

---

[3] The irregularity at issue in the first trial was Michael's and his counsel's secreting Armstrong away in a hotel so that defendants could not locate him to testify as

**The summary judgment and second trial**

On May 26, 2011, after the matter was remanded, defendants filed a motion for summary judgment or alternatively summary adjudication against Michael on the ground that he lacked standing to pursue claims for breach of contract, fraud, conversion, or an accounting.[4] In support of the motion, defendants cited the 1996 and 1997 agreements governing the business venture, in which Michael was not designated a signatory, party, or shareholder.

Defendants also produced evidence from Michael's deposition and testimony at the first jury trial that it was Mary, not Michael, who had provided all the funds used in the business venture. In his deposition, Michael testified that all the documents were put in Mary's name because she "was putting the money in" and wanted the documents and shares in her name instead of Michael's name. At the first jury trial, Michael testified that he was not a signatory to the agreements because his and Mary's financial advisor told them to put the documents in Mary's name.

In their motion, defendants asserted that Michael could not establish a breach of contract claim because he was not a party to the contracts. Michael could not establish damages for fraud or conversion because Mary owned all the funds contributed to the business venture. Michael was not entitled to an accounting because he was not a stockholder.

Michael opposed the summary judgment motion on the ground that triable issues of material fact existed as to whether his status as Mary's husband and owner of a community interest in the funds invested in the business gave him standing to pursue the remaining claims. In addition, Michael contended that he negotiated and signed deal

---

part of their case-in-chief. We reversed based, in part, on evidence adduced posttrial that, contrary to plaintiffs' assertions at the first trial, defendants were not siphoning funds from the corporation, and all of plaintiffs' investment was put into the corporation.

[4] Defendants also asserted that the conspiracy claim lacked merit because conspiracy is only a theory to impose liability against a joint tortfeasor and is not an independent cause of action. Michael conceded that summary adjudication of this claim was appropriate.

4

memos, which were part of the "series" of documents and agreements. Michael cited James's discovery response, which stated, "'Actually [the] agreement was with Michael Marsh,'" as evidence that Michael had standing to pursue the claims in the complaint. Alternatively, there were triable issues of material fact as to whether Michael had standing to enforce the agreements as a third party beneficiary. Michael also relied on *Patrick v. Alacer Corp.* (2008) 167 Cal.App.4th 995 (*Patrick*) to argue that his community property interest in the funds Mary used to acquire the stock and invest in the venture gave him standing to bring the contract and tort claims herein.

In reply, defendants noted that Michael had dismissed in 2004 all but his breach of contract, fraud, conversion and accounting causes of action. Defendants argued *Patrick* was distinguishable because of the special standing requirements for a shareholder derivative claim, which in *Patrick* was brought by a wife after her spouse had died. (167 Cal.App.4th at pp. 1000–1001.) Defendants reiterated that Michael had not signed either agreement and asserted the complete absence of evidence that would have supported his status as a third party beneficiary of the agreements. At most, Michael was an incidental beneficiary, which, under the applicable case law, was insufficient for standing to bring a breach of contract claim. Defendants further contended that precontract discussions were irrelevant to the issue of whether Michael was a party to the contracts.

The trial court granted the summary judgment motion against Michael on October 3, 2011. As to the breach of contract cause of action, the trial court concluded that the documents attached to the complaint demonstrated that only Mary was a "named party to the contracts," and thus Michael lacked standing to pursue the cause of action. As to the fraud cause of action, the court held that the evidence "demonstrates that funds invested in the project were provided by . . . Mary," and that Michael's claim of a community property interest in those funds "would be addressed in a Family Law Court, but have no bearing on this civil action." Similarly, the trial court ruled that Michael lacked standing to bring a conversion claim given that the funds invested in the project were provided by Mary, and that Michael's remedy regarding his claim of a community

5

property interest in those funds was in the family court. For all these reasons, the accounting claim "fail[ed]."

On November 5, 2012, Mary proceeded to a jury trial on the breach of contract, promissory fraud, concealment, and conversion causes of action; defendants prevailed on all four claims. As to the breach of contract claim, the jury found that Mary and James had entered into a contract and that Mary had done "the significant things" that the contracts required, but that "all conditions for James['s] performance" had not occurred. As to the promissory fraud claim, the jury found that James had made promises to Mary "that [were] important to the transaction," but answered "no" to the question of whether James "did not intend to perform" those promises. Similarly, as to the concealment claim, the jury found that James did not "intend to deceive Mary . . . by intentionally failing to disclose important" facts. The jury also found that James was not liable for conversion of money "belonging to Mary."

On January 3, 2013, the trial court entered judgment in favor of defendants and against both plaintiffs. Michael and Mary filed a timely notice of appeal from the judgment.

## DISCUSSION

**Summary judgment and appellate review standards**

The trial court must grant summary judgment when the moving and opposition papers demonstrate that there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)

A defendant moving for summary judgment has the initial burden of persuading the court that there is no dispute as to a material fact regarding an element of the cause of

6

action at issue, or there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, *supra*, 25 Cal.4th at p. 850.) If the defendant makes the initial showing, the burden shifts to the plaintiff to make a prima facie showing that a triable issue of material fact exists. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, *supra*, at p. 850.) An appellate court reviews an order granting summary judgment de novo. (*Coral Construction, Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315, 336.)

**The trial court correctly held that there were undisputed material facts evidencing Michael's lack of standing to assert the contract and tort claims herein**

### The contract claim

Defendants moved for summary adjudication of the contract claim on the ground Michael lacked standing.[5] "Every action must be prosecuted in the name of the real party in interest, except as otherwise provided by statute." (Code Civ. Proc., § 367.)

"It is elementary that a party asserting a claim must have standing to do so. In asserting a claim based upon a contract, this generally requires the party to be a signatory to the contract, or to be an intended third party beneficiary." (*Berclain America Latina v. Baan Co.* (1999) 74 Cal.App.4th 401, 405.)

It was undisputed that Michael was not a signatory or a party to the 1996 and 1997 agreements. The only signatories to those agreements were Mary (a shareholder and officer of Café Concepts and Tortilla Fresh), James (an officer, majority shareholder, and board member of Café Concepts and Tortilla Fresh), and Armstrong (chief financial officer and a board member of Café Concepts). Simply put, the contracts, on their face,

---

[5] Plaintiffs assert that defendants are estopped from arguing lack of standing because defendants raised that issue for the first time after we ordered a new trial. At the same time, they concede, as they must, that as a "jurisdictional defect," "[l]ack of standing can be raised at any time in the proceeding." (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432.) Plaintiffs also concede that they failed to raise the estoppel argument in opposing the summary judgment motion before us. We conclude that plaintiffs' failure to raise estoppel in the trial court constitutes a failure to preserve that issue for appeal.

demonstrated that, Mary, not Michael, was a signatory/owner/shareholder/and officer of the business venture. Indeed, Michael testified at his deposition that the decision to put the contracts in her name was not an oversight, but instead a deliberate decision upon advice of their financial advisor.

Lacking standing as a signatory to the agreements, Michael next contends that there were disputed material facts as to whether he was a third party beneficiary of the agreements. "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." (Civ. Code, § 1559.) The only evidence to support his contention is that he negotiated the terms of the agreements and signed some preliminary documents leading up to the 1996 and 1997 agreements. Nothing in the executed agreements suggests that the agreements were made expressly for his benefit. At most, the evidence might demonstrate that Michael incidentally benefited from the performance of the contracts executed by James, Mary, and Armstrong only. An incidental benefit to a third party, however, is insufficient to confer standing to that third party to pursue a breach of contract claim. (*Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1022.)

Nor does Michael's assertion that he had a community property interest in funds used to finance the business venture confer standing on him to sue for breach of contract. The case law is clear that the mere fact that community assets may have been involved in a contractual transaction does not give the nonsignatory spouse standing to sue on the contract. For example, in *Hatchwell v. Blue Shield of California* (1988) 198 Cal.App.3d 1027, the appellate court held that a wife's community property interest in her husband's benefits under an insurance policy did not give the wife standing to sue either as a party or a third party beneficiary for contract or tort damages arising out of the insurance company's failure to pay her husband's medical benefits (as opposed to her own) — notwithstanding that she reviewed and investigated the policy and made the decision to purchase the policy as the family's health insurance plan. "Someone who is not a party to [a] contract has no standing to enforce the contract or to recover extra-contract damages for wrongful withholding of benefits to the contracting party." (*Id.* at p.1034.)

8

Whatever Michael's rights may have been concerning his community property interests, there is no dispute that he was not a party to the agreements, nor did he produce evidence demonstrating that he was a third party beneficiary of those agreements. Indeed, all the evidence is to the contrary, Michael having testified that Mary and he expressly chose not to make him a party. In sum, because Michael failed to produce evidence demonstrating a triable issue of material fact regarding his lack of standing, the trial court properly summarily adjudicated the breach of contract claim against him.

**The fraud and conversion claims**

Similarly, the stock and all corporate documents were placed in Mary's name; the money funding the corporation came out of Mary's own professional checking account. At his deposition, Michael conceded that the stock was issued solely in Mary's name because "she was putting the money in." He testified: "Since Mary was putting the money in, she wanted to make sure that it was in her name. So when there were share certificates that were going to be issued, she wanted them in her name." To oppose the summary judgment, Michael produced evidence that he handled negotiations with James, which prompted Mary to enter into the business venture. He also asserted that he had a community property interest in the professional account from which Mary's investment in the corporation derived, and under *Patrick*, *supra*, 167 Cal.App.4th 995, that community property interest was sufficient ground on which to base standing to assert his tort claims.

*Patrick* does not support Michael's argument. It is true that in *Patrick*, in reversing the trial court's sustaining of a demurrer to a derivative claim for fraud, breach of fiduciary duty, and constructive trust, among other claims, the appellate court held that a wife's allegation of a community interest in stock originally in her husband's name later put into a trust was sufficient to support standing. (167 Cal.App.4th at p. 1011.) The factual context giving rise to that holding is inapposite to the facts before us.

There, wife and husband cofounded a highly successful vitamin supplement company. Both were officers in the corporation and financially supported the corporation during their marriage. Planning to divorce his wife, the husband put the shares in a trust,

9

which provided that 46 percent of the shares be distributed to the wife upon the husband's death to satisfy whatever community property interest she had in the corporation and to prevent her from obtaining control of the company. The trust was the only shareholder of record. When her husband's death was imminent, the individual defendants obtained her vote to become directors of the corporation upon promises that they would serve only temporarily and take minimum compensation. Once the husband died, among other alleged misdeeds, the individual defendants did not transfer the stock to the wife and looted the corporation.

In finding that the wife had standing to bring a derivative claim on the corporation's behalf, the appellate court relied on the unique features of a derivative claim: "The standing requirements for a derivative action reflect the limited adverse relationship between the shareholder plaintiff and the corporation." (*Patrick*, *supra*, 167 Cal.App.4th at p. 1004.) All the plaintiff needed to allege for a derivative claim was that plaintiff "is a record or beneficial shareholder of the corporation." (*Ibid.*) Taking all allegations as true in ruling on a demurrer, the appellate court held that the wife's allegation that she was entitled to a fair share of the profits from a community endeavor involving the couple's joint efforts was sufficient to render her a beneficial shareholder for purposes of a derivative claim. (*Id*. at p.1011 [relying on Corp. Code, section 800, subd. (b)(1) providing that plaintiff in a derivative claim must allege that plaintiff "'was a shareholder, of record or beneficially . . . at the time of the [relevant] transaction'"].) In contrast, the appellate court affirmed the trial court's sustaining of the demurrer to the wife's direct fraud claim for lack of causation. (*Patrick*, *supra*, at pp. 1016–1017.)

In the case before us, both spouses are alive and there was no shareholder's derivative claim. There was no need for Michael to pursue any claims against defendants concerning the failed venture because Mary, the owner of the stock, could, and did pursue the claims against defendants in her own name. As noted above, *Patrick* eliminated the wife's direct claims notwithstanding any asserted community property interest. We hold that *Patrick* is not controlling and that the trial court correctly granted summary judgment of Michael's claims for lack of standing.

10

**Even if, arguendo, summary judgment was improvidently granted, the record and jury instructions reveal that any such error was harmless**

Citing *Mueller v. J.C. Penney Co.* (1985) 173 Cal.App.3d 713 (*Mueller*), among other cases, defendants contend that even if the trial court's grant of summary judgment against Michael were erroneous, that error was harmless because Michael and Mary were in privity, and Michael would therefore be bound by the jury's verdict adverse to Mary under res judicata and related doctrines of preclusion. Michael counters that as a consequence of the trial court's ruling he was "essentially excised from the proceedings" and that Mary was "forced . . . to present an entirely different case to the jury."

In *Mueller*, the wife brought assault and battery claims against the defendant store, and the husband a loss of consortium claim arising out of the wife's alleged physical contact with a security guard who suspected the wife of shoplifting. The defendant store prevailed at trial. While the civil case was pending, the wife was convicted of misdemeanor assault and battery. The appellate court held that collateral estoppel precluded the wife from contesting that she had, in fact, shoplifted. (*Mueller*, *supra*, 173 Cal.App.3d at p. 719.)

Although the *Mueller* court concluded that the trial court had erroneously denied the husband's right to examine witnesses on his loss of consortium claim, that error was harmless because he was in privity with his wife. "To prevail on his consortium action, [husband] must show liability ([the defendant's] tortious injury to [wife]) and damages. Liability, an issue in this civil case, has necessarily been decided adversely to [wife]. Moreover, in any subsequent action for loss of consortium, [wife's] action against [the defendant] would be a final judgment on the merits. Thus, [husband] is barred by the adverse determination against [wife] if he is in privity with [wife] in her action against [the defendant]. [¶] . . . Privity refers to a relationship . . . 'sufficiently close' so as to justify applying collateral estoppel. [Citation.] Under California law, spouses are in privity with each other where the cause of action in the prior litigation was 'community in nature' and the 'proceeds of any judgment that might have been recovered . . . would

11

have belonged to both husband and wife, as community property.' [Citations.]"
(*Mueller*, *supra*, 173 Cal.App.3d at p. 723.)

As set forth above, Michael's theory is that he had a community property interest in the funds Mary invested in the corporation. All of Michael's claims derived from theories about how funds supplied by Mary were misused by defendants. Michael and Mary were thus in privity vis-a-vis claims that defendants misused those funds. A jury determined that defendants were not liable to Mary on any of her claims. If the summary judgment were reversed, *Mueller* and principles of res judicata and collateral estoppel would not allow Michael to relitigate those claims.

Michael next contends that Mary's trial was somehow infected by his no longer being a party. He argues that Mary, who was not a party to the negotiations to form the business venture, could not have supplied the evidence that was needed to prove breach of contract, fraud, or conversion. That error was compounded because Michael, who was no longer a party to proceedings, was relegated to being a mere witness at trial. In addition, he claims that the jury may have been misled by the special verdict form, which asked if James made promises to Mary or failed to disclose important facts to Mary, whereas all James's representations and communications were made to Michael. According to Michael, "It was, quite simply, an entirely different case the jury was called upon to consider than the one where [Michael] was a plaintiff."

The record simply does not support this contention, which is speculative at best. At trial, Michael testified extensively about his involvement in the formation of the business venture and the roles that the various persons played. Michael stated that he was looking for opportunities to invest in restaurants in the early 1990's, and that Michael and Mary had purchased an ownership interest in Fastrack Inc. also known as Bonjour Bagel & Coffee (Bonjour Bagel) from a man named Steve Metz (Metz). Initially, Michael was only an investor, but, although the investment started off well, in around 1996 problems began to occur because of Metz's mismanagement. Michael took over the management after Metz was terminated. In June 1996, James agreed to help Michael out with some issues that had arisen with Bonjour Bagel; James ultimately agreed to purchase Bonjour

Bagel's assets if he did not have to deal with claims being made against Bonjour Bagel by some of its franchisees.

Michael was very impressed after visiting James's Tortilla Fresh restaurant in the Lancaster-Palmdale area. From 1995 to the early part of 1996, Michael negotiated with James and Rick Armstrong to operate Tortilla Fresh franchises; he and Mary wanted to be passive investors in the company. Michael and Mary began putting money into the business in early 1996. In earlier negotiations, Michael was supposed to be on the board of Tortilla Fresh. After talking to their financial advisor, Michael and Mary decided to have Mary be the shareholder and not Michael. The couple used Mary's money for the investments. Michael testified further that Mary and he contributed $320,000 to the business venture.

In 1996, James told Michael that there was a potential opportunity for Tortilla Fresh to do a joint venture with Edwards Cinema. James knew the owner of Edwards Cinema, who was interested in having Tortilla Fresh placed in all the theaters. Michael also knew that James was operating ten Little Caesar restaurants. Relying on this information, Michael and Mary gave James "more money." At some point, the Edwards Cinema deal fell through, but James told Michael that they could still rent from the retail mall.

In early 1997, James shared his vision about Café Concepts with Michael. James said that Tortilla Fresh was too limited in scope. James suggested that they expand the concept to include a food mart with different kinds of food including breakfast, lunch, and dinner with regular and children's menus. James did not tell Michael that James had closed the Lancaster Tortilla Fresh location.

Michael also testified that communications with James and Rick occurred through him and not Mary. Toward the end of 1997, Michael was concerned about the lack of progress. He and James had a meeting in early March 1998 to discuss where the money was going. James told him the money was being spent on development costs, Bonjour Bagel, Armstrong's fees, legal expenses, and cabinets, among other expenses.

13

Michael also testified that he had several conversations with James about the business venture over a couple of months. James corresponded with him or told him about prospective store locations, including the potential to have locations in Edwards Cinemas. As previously noted, James's statements prompted Michael and Mary to give James money. James corresponded with Michael about opening bank accounts and filing papers to establish the corporation. Michael understood James's statements to be "promises" and that it was going be "a really exciting opportunity."

Significantly, during trial Mary's counsel stipulated that Michael was acting as Mary's agent during the negotiations. The jury was instructed with CACI No. 1906 as follows: "MISREPRESENTATIONS MADE TO PERSONS OTHER THAN THE PLAINTIFF [¶] James Mindis and/or Lynn Mindis is responsible for a representation that was not made directly to Mary Dousette if he and/or she made the representation to a group of persons including Mary Dousette or to another person, intending or reasonably expecting that it would be repeated to Mary Dousette." It does not appear from the record that Mary's counsel objected to the jury instructions, which he told the court required "only very minor tweaks." There was no objection to the special verdict forms. Indeed, the record reflects that Mary's counsel submitted the special verdict forms to the trial court and announced his agreement to them.

Under these circumstances, the jury was amply informed of Michael's leading role in negotiating the agreements, the representations James made to Michael about the progress of the corporation, and how the invested funds were being spent. Contrary to Michael's assertions, Michael was far from invisible at trial. The record is replete with the very testimony he contends was "excised" by virtue of the grant of summary judgment. Michael's speculation that the jury could have been misled by the special verdict form is just that. The jury was instructed under CACI No. 1906 that a misrepresentation did not have to be made to Mary directly, but instead to others, if it could be reasonably expected that the misrepresentation would be repeated to Mary.

Indeed, at oral argument, defendant's counsel was given an opportunity to provide citations to the record to support his contention that defendants argued at trial that there

14

were representations made to Michael that were not intended to be communicated to Mary. In response, defendants' counsel conceded that the record did not support the latter argument and acknowledged that trial counsel had stipulated before the jury that "'Michael Marsh and Mary Dousette are agents of each other.'" He also enclosed an e-mail from defendants' trial counsel in which trial counsel represented that "[d]efendants conceded at trial (as indicated by the instruction) that communications to Marsh were deemed to be communications to Dousette. I never argued otherwise."

In sum, the defense verdict on Mary's claims would preclude Michael from relitigating the claims Mary lost at trial, and any error in granting summary judgment against Michael was harmless.

## DISPOSITION

The judgment is affirmed. Defendants are awarded their costs on appeal.

NOT TO BE PUBLISHED.


BENDIX, J.*

We concur:


ROTHSCHILD, P. J.


JOHNSON, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.